85 Cal.Rptr.2d 744 (1999)
72 Cal.App.4th 1276
The PEOPLE, Plaintiff and Respondent,
v.
Juan CHUTAN, Defendant and Appellant.
No. G020930.
Court of Appeal, Fourth District, Division Three.
June 11, 1999.
Rehearing Denied July 8, 1999.
Review Denied September 29, 1999.
*745 Michael B. Dashjian, under appointment by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Esteban Hernandez and William M. Wood, Deputy *746 Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
BEDSWORTH, J.
A jury convicted Juan Chutan of committing continuous sexual abuse and five specific forcible lewd acts upon a child, Eloisa. It also specifically found the continuous abuse was accomplished by force, violence and duress. Chutan insists the trial court erred by (1) admitting involuntary statements he made as a result of police violations of Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 and Massiah v. United States (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; (2) admitting the victim's out-of-court statements in violation of his Sixth Amendment right to confront his accuser; (3) permitting the prosecution to impeach him with statements he made to a social worker; (4) receiving his admissions about three lewd acts for which no corpus delicti was established; and (5) providing the jury a defective definition of reasonable doubt. We find no merit in any of these contentions and affirm the judgment.

* * *
By the time she reached the tender age of seven, Eloisa would probably have given anything to live in what Joyce Kilmer referred to as "The tragic house, the house with nobody in it."[1] Her house was even more distressing than Kilmer's, because her mother's boyfriend, Chutan, was in it with her,
After school, Eloisa was left to' parent her younger siblings, whom Chutan had sired, while her mother worked into the evenings. Chutan typically left the house around three o'clock in the afternoon to attend work as well  but not always. On those other occasions, over a three-year period, he beat Eloisa with a belt and forced her to engage in a variety of sexual acts, including oral copulation and vaginal and anal intercourse. He penetrated her with foreign objects and caused severe tearing and bleeding  which he told her was normal. And she endured all this because he threatened that he would kill her or  at the very least  her mother would throw her put of the house if she were ever to tell anyone what was going on.
In time, Eloisa tearfully revealed the trauma she was having to deal with to a neighbor, who reported it to the proper authorities. Once an investigation was underway, the children were placed in county care at Orangewood Children's Home pending resolution of a disposition hearing in the juvenile court.
One evening, Craig Kelsey and Ronald Burleson, plain clothes detectives with the Orange Police Department, drove an unmarked police car to Chutan's residence. Kelsey knocked on the door, and when Chutan answered, he displayed his badge and identified himself as a police investigator "involved with [Chutan's] children." Chutan invited the detectives in, but Kelsey asked Chutan if he would instead go to the police station  which was about two miles away  for an interview. Chutan said he would, but he had no transportation. When Kelsey offered to drive him to and from the station house, Chutan agreed.
He was neither handcuffed nor otherwise physically restrained, and before he was taken to the police department, he was assured he was not being placed under arrest. During the ride, he made light conversation with the officers and mentioned his soccer exploits, which led to a short discussion about his involvement in the sport.
Upon arrival at the station, Chutan was taken to an interview room where he waited briefly with Burleson as Kelsey prepared some paperwork. When Kelsey finally entered the room, Burleson left and a taperecorded interview began. No Miranda warnings were given, and no offer of an attorney was made.
Chutan initially denied molesting Eloisa. So Kelsey told him, "This is your opportunity and, I mean, you're gonna get one opportunity to tell me the whole truth here. Urn, what *747 happens here affects your whole family.... I need to know the truth." In response, Chutan confessed to committing five separate lewd acts on Eloisa during the previous four months. When the interview was over, Chutan was driven home.

I
Chutan contends the trial court committed reversible error by admitting his confession because it was not voluntary, it was not preceded by Miranda warnings (Miranda v. Arizona, supra, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), and it was obtained without his counsel being present in violation of Massiah v. United States, supra, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. None of these arguments is availing. We find no evidence of a due process violation and, as we see it, neither Miranda nor Massiah applies.
First, Chutan claims his confession was involuntary because Detective Kelsey failed to reveal he was conducting a criminal investigation and not just asking questions related to the placement of his children. According to Chutan, this deception by omission constituted trickery which rendered his confession involuntary. This argument is  as our less western neighbors would say  all hat and no cattle.
Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal Due Process clause. (People v. Thompson (1990) 50 Cal.3d 134, 167, 266 Cal.Rptr. 309, 785 P.2d 857.) Why? Because subterfuge is not necessarily coercive in nature. (People v. Felix (1977) 72 Cal.App.3d 879, 885-886, 139 Cal. Rptr. 366.) And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made. (Colorado v. Connelly (1986) 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473, 484; People v. Mickey (1991) 54 Cal.3d 612, 650, 286 Cal.Rptr. 801, 818 P.2d 84.)
So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a false confession, confessions prompted by deception are admissible in evidence. (People v. Jones (1998) 17 Cal.4th 279, 299, 70 Cal.Rptr.2d 793, 949 P.2d 890; People v. Parrison (1982) 137 Cal. App.3d 529, 537, 187 Cal.Rptr. 123.) Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion. (See, e.g., Frazier v. Cupp (1969) 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684, 693, 89 S.Ct. 1420[officer falsely told the suspect his accomplice had been captured and confessed]; People v. Jones, supra, 17 Cal.4th at p. 299, 70 Cal.Rptr.2d 793, 949 P.2d 890 [officer implied he could prove more than he actually could]; People v. Thompson, supra, 50 Cal.3d at p. 167, 266 Cal.Rptr. 309, 785 P.2d 857 [officers repeatedly lied, insisting they had evidence linking the suspect to a homicide]; In re Walker (1974) 10 Cal.3d 764, 777, 112 Cal.Rptr. 177, 518 P.2d 1129 [wounded suspect told he might die before he reached the hospital, so he should talk while he still had the chance]; People v. Parrison, supra, 137 Cal.App.3d 529, 537, 187 Cal.Rptr. 123 [police falsely told suspect a gun residue test produced a positive result]; People v. Watkins (1970) 6 Cal.App.3d 119, 124-125, 85 Cal.Rptr. 621 [officer told suspect his fingerprints had been found on the getaway car, although no prints had been obtained]; and Amaya-Ruiz v. Stewart (9th Cir.1997) 121 F.3d 486, 495 [suspect falsely told he had been identified by an eyewitness].)
We also find Colorado v. Spring (1987) 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 instructive. There, agents of the federal Bureau of Alcohol, Tobacco and Firearms (ATF) received information Spring was engaged in the interstate shipment of stolen firearms and also was responsible for an unsolved homicide in Colorado. So they set up an undercover sting operation to purchase firearms from Spring and arrested him during the sale.
Prior to his interrogation, Spring provided the officers oral and written waivers of his Miranda rights, apparently anticipating he was only going to be questioned about his involvement with the firearms. During the interview, however, agents asked if he had ever shot someone, and Spring admitted he had. (Colorado v. Spring, supra, 479 U.S. at *748 p. 567, 107 S.Ct. at p. 853, 93 L.Ed.2d at p. 961.) Two months later, officers contacted Spring in jail and told him they wanted to question him about the homicide. After again waiving his rights under Miranda, Spring confessed to the homicide and was subsequently convicted of murder. (Id. at pp. 567-569, 107 S.Ct. at pp. 853-855, 93 L.Ed.2d at pp. 961-962.)
On appeal, Spring contended his initial waiver of rights under Miranda was invalid because the officers had failed to disclose their intention to discuss the homicide. He also insisted his subsequent statements were tainted fruit of that violation. The United States Supreme Court disagreed, reiterating comments it had made during the prior term in Moran v. Burbine (1986) 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410: "We have held that a valid waiver does not require that an individual be informed of all information `useful' in making his decision or all information that `might ... affec[t] his decision to confess.' [Citation.] `[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.]" (Colorado v. Spring, supra, 479 U.S. at pp. 576-577, 107 S.Ct. at p. 859, 93 L.Ed.2d at p. 967; cf. People v. Bradford (1997) 14 Cal.4th 1005, 1045-1046, 60 Cal.Rptr.2d 225, 929 P.2d 544.)
The court added, "Spring nevertheless insists that the failure of the ATF agents to inform him that he would be questioned about the murder constituted official `trickery' sufficient to invalidate his waiver of his Fifth Amendment privilege, even if the official conduct did not amount to `coercion.' Even assuming that Spring's proposed distinction has merit, we reject his conclusion. This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is `trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today." (Colorado v. Spring, supra, 479 U.S. at p. 576, 107 S.Ct. at p. 858, 93 L.Ed.2d at p. 967.)
If the failure to advise a suspect about the subject of an interrogation does not invalidate that suspect's waiver of rights under Miranda, then it is difficult to perceive how the failure to brief a suspect on the official plan for an interrogation can constitute coercion for purposes of the Due Process Clause. In fact, in Spring, the court at least implicitly reached the opposite conclusion, by accepting the determination of the trial judge "that `there was no element of duress or coercion- used to induce Spring's statements.'" (Colorado v. Spring, supra, 479 U.S. at p. 575, 107 S.Ct. at p. 858, 93 L.Ed.2d at p. 967.)
Similarly here, we find nothing in Detective Kelsey's failure to advise Chutan about the criminal nature of the investigation which implicates his due process rights. Nor do we find anything in what Kelsey actually did say that was deceptive or at all misleading. Kelsey did, in fact, meet with Chutan to talk about the children who had been taken from his home  and about what Chutan had done to one of them. If Chutan misinterpreted Kelsey's comment, as we have said before in a similar context, "his decision to cooperate was [not] a mistake ... for which the rest of us should be penalized." (People v. Bennett (1998) 68 Cal.App.4th 396, 403, 80 Cal.Rptr.2d 323.)
Nor do we find anything coercive in Kelsey's statement that "what happens here affects your whole family." That statement was clearly true, and at the time it was made, Chutan was well aware of why he was being questioned. When asked why he thought he was being interviewed, he answered, "Well, supposed to be, ah, ... Eloisa say something about ... um, how can I say that, ah, sex  sex or whatever it is, you know, with her. [¶] ... [¶] That's ... why [I'm] coming right here." (Cf. Miller v. Fenton (3d Cir.1986) 796 F.2d 598, 603 [officer's adjuration, "You've got to come forward. You've got to do it for your family, ... that's what's important, the truth," did not invalidate confession].)
Next, Chutan complains because Kelsey never read him Miranda warnings. However, we find no warnings were required since Chutan was not in custody at the time of the interrogation. He was invited to the *749 police station and expressly told he was not under arrest. Moreover, after he had given his statement, he was returned to his home, as promised. The fact the interrogation actually occurred at the station house is, of course, not dispositive. (California v. Beheler (1983) 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279-1280; Oregon v. Mathiason (1977) 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719; People v. Stansbury (1995) 9 Cal.4th 824, 831-832, 38 Cal.Rptr.2d 394, 889 P.2d 588.) Neither detective did or said anything that might cause a reasonable person to believe he was in custody or otherwise deprived of his freedom and, absent that, Miranda did not apply. (Berkemer v. McCarty (1984) 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 335; People v. Stansbury, supra, 9 Cal.4th at p. 830, 38 Cal.Rptr.2d 394, 889 P.2d 588; In re Joseph R. (1998) 65 Cal.App.4th 954, 958-960, 76 Cal.Rptr.2d 887.)
Chutan also insists the interrogation violated his Sixth Amendment right to counsel under Massiah v. United States, supra, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 since, at the time of the interrogation, he was represented by counsel in a related juvenile court proceeding concerned with placement of his children. Again, the argument is not well taken. In fact, the United States Supreme Court has recognized that the foundation for it rests upon a premise which has not been the law since at least 1966. (See In re Joseph R., supra, 65 Cal.App.4th at p. 959, fn. 6, 76 Cal.Rptr.2d 887; cf. Moran v. Burbine, supra, 475 U.S. at pp. 428-430, 106 S.Ct. at pp. 1144-1146, 89 L.Ed.2d at p. 426.)
The high court has made it abundantly clear that, as the Sixth Amendment expressly provides, the right to counsel applies only when a person stands "accused" in a "criminal prosecution." A juvenile dependency proceeding is simply not a criminal prosecution. Moreover, the right to counsel is "offense specific"  i.e., it is limited in its application to a single criminal case in which adversary proceedings have commenced by way of indictment or arraignment on a criminal complaint (McNeil v. Wisconsin (1991) 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166-167; accord People v. Bradford (1997) 15 Cal.4th 1229, 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Webb (1993) 6 Cal.4th 494, 527, 24 Cal. Rptr.2d 779, 862 P.2d 779; People v. Wader (1993) 5 Cal.4th 610, 636, 654, 20 Cal.Rptr.2d 788, 854 P.2d 80; In re Wilson (1992) 3 Cal.4th 945, 950-951, 13 Cal.Rptr.2d 269, 838 P.2d 1222; People v. Clair (1992) 2 Cal.4th 629, 657, 7 Cal.Rptr.2d 564, 828 P.2d 705)  and at the time of the interrogation here, Chutan had not yet been charged with any criminal offense in any case.
In sum, we find no Fourteenth Amendment, Fifth-Amendment-related Miranda or Sixth Amendment problem with the admission of Chutan's confession. We therefore conclude the trial court did not err by receiving it in evidence.

II-V[**]
The judgment is affirmed in its entirety.
RYLAARSDAM, Acting P.J, and SEYMOUR, J,[***], concur.
NOTES
[*] Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V.
[1] Kilmer, The House With Nobody In It, in Best Loved Poems of the American People (Doubleday & Co., Inc., Felleman, edit. 1936) page 533.
[**] See footnote*, ante.
[***] Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.