Filed 4/17/13  P. v. Ortega CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B235552 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA084059) |
| v. | |
| ALBERT ORTEGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Tomson T. Ong, Judge.  Affirmed as modified.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury found Albert Ortega guilty of first degree murder, with special circumstance and firearm allegations found true. The trial court sentenced him to a state prison term of life without the possibility of parole, plus a consecutive 25-year-to-life term for the firearm enhancement. He appeals, claiming error in the trial court's admission of his confession among other errors. We agree that a penalty assessment and parole revocation fine should be stricken but otherwise affirm.

## FACTUAL AND PROCEDURAL SUMMARY

At about 11:30 a.m. on November 22, 2009, Patrick McIntyre was working on his motorcycle on his front porch on the corner of 18th Street and Cabrillo in San Pedro when he heard a gunshot in an alley nearby. About 15 to 20 seconds later, he saw three young men running from the alley. Albert Ortega and his brother Joaquin were chasing a man later identified as 17-year-old Michael Alfaro. As he ran, Alfaro yelled, "No, please, no." McIntyre was approaching to intervene until he saw Ortega holding a shotgun.

Alfaro ran to the middle of the street and stopped, looking like he was about to collapse. Joaquin stopped, but Ortega followed Alfaro into the street. Alfaro was unarmed and pleaded with Ortega as he approached: "No, please, dog, don't shoot me." Ortega held the shotgun within six inches of Alfaro and shot him. McIntyre got on his motorcycle and followed Ortega as he ran but lost him in the alley.

Lindsey Harper heard two gunshots and ran to her balcony where she saw Ortega. Eve Lorentzen and Anthony Dobay were also witnesses to these events and identified Ortega as well.

A 9-1-1 operator received a call about the shooting at 11:30 a.m. Alfaro was found dead at the corner of 18th Street and Cabrillo, lying in a pool of blood. He died

2

from gunshot wounds to the back and shoulder.[1] Multiple shotgun pellets were recovered, and there was little "spread" which meant Alfaro was shot at very close range.

Los Angeles Police Department (LAPD) officers responded, and at about 3:00 p.m., Margaret Perez approached LAPD Officer Joseph Sellner. Based on information from Perez, a canine officer (Jeff Miller) and his dog Lana searched the area for gunpowder. Lana alerted Miller to a trashcan behind Ortega's building. When Miller opened the trashcan and pulled out a black bag, his dog alerted to the bag as well.

The bag contained a 12-gauge shotgun containing one live round, three live shells inside a sock and two expended shell casings. There was a bloodstain on the sawed-off barrel of the shotgun. Altering a shotgun in such a manner makes it difficult to load and easy for a shooter to catch the web of his hand in the mechanism. The black bag also contained a box cutter, several pairs of gloves, a red devil hooded Halloween mask, a bandana and black knit head covering. One right hand glove had bloodstains and a hole at the web.

Officers also noted blood at the scene, with a blood trial leading from the alley to 18th Street, blood at the corner of 18th Street and Cabrillo and a trail leading to 17th Street and Ortega's residence. Inside the building, there was blood on the stairway handrail leading up to Ortega's apartment. There was blood on the inner doorknob and bloodstains on the floor leading to the bathroom.

Based on witness statements and the blood trail, police officers went to Ortega's apartment. Ortega opened the door; Joaquin was in a bedroom. The two were detained outside while officers searched the apartment pursuant to a warrant. Officers recovered

---

[1] The first shotgun wound was a gaping but nonfatal shoulder wound. A person receiving such a wound could remain ambulatory for a time afterward. The second wound was a fatal shotgun wound to the midback. It completely severed Alfaro's spinal cord, with pellets also perforating his aorta and lung. The second wound caused Alfaro to bleed out very quickly and was rapidly fatal.

Ortega's cell phone, a black cap covered in Ajax and a jersey with a hole consistent with shooting a shotgun through it.  Ortega had a cut on the web of his right hand covered by a bandage.[2]

Detective David Cortez interviewed Ortega's sister Erica that night.  While she and her mother were out, she said, Ortega called and told them to come home.  He said he did "something bad."  She said Ortega was angry because he had been stabbed and almost died two years earlier.  She said Ortega "kept wanting to get the guy who did it but my mom kept saying no. . . .  He said that the guy that they killed supposedly or whatever I guess called my brothers to get something from them."  She said "some Black guy" called "Dodge" had stabbed Ortega, and Ortega said the guy he shot was Dodge's cousin.  A few months earlier, she said, Ortega and Joaquin told their mother about seeing this guy at a bus stop, and she said "you guys are crazy."  "We said that [Ortega] was being crazy and that you think everyone is that person—that person cannot be him."  Ortega told Erica that Alfaro had "randomly" called and wanted to buy "weed or something" from Ortega and Joaquin.  They had been waiting this whole time to pay someone back.  When they met up with Alfaro, Ortega and Joaquin "didn't wait" and shot him.

Ortega was charged with one count of murder in violation of Penal Code section 187, subdivision (a), with the special allegation he killed Alfaro by means of lying in wait within the meaning of section 190.2, subdivision (a)(15).[3]  It was further alleged Ortega personally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (d).

---

[2]  It was stipulated that the blood evidence from the shotgun and bathroom matched Ortega's DNA.

[3]  All undesignated statutory references are to the Penal Code.

At trial, the People presented evidence of the facts summarized above. The jury heard Erica's recorded interview as well as evidence of the cell phone exchanges between Ortega and his family.

Within minutes of the 11:30 a.m. shooting, Ortega, Joaquin, Erica and Angelina (their mother) exchanged multiple text messages and phone calls. At 11:33 a.m., a call was made from Ortega's cell phone to Erica's phone. At 11:45 a.m., she texted Ortega: "Don't get extra clothes. Just change outfits." At 11:47 a.m., she texted: "Don't say nothing to anyone." At 12:17 and 12:25 p.m., Ortega texted his mother: "Change Wakka's cell."[4] He sent the same text message to Erica at 12:19 p.m. At 12:25 p.m., Joaquin's cell phone number stopped receiving calls and text messages; at 12:29 p.m., calls and texts resumed on Joaquin's other cell phone number. At 12:27 p.m., Erica texted Ortega: "We did."

At 12:29 p.m., Erica texted: "By Jrs. Turn your TV off and stay quiet." At 12:48 p.m., she texted: "Get your asses in the shower now." At 12:48 p.m, Ortega texted, "How is it out there?" and she responded: "Cops like cray. More are coming. Calm down. Don't be scared." At 12:55 p.m., Erica texted: "Now, Albert, whatever you guys do, don't show fear or act nervous or scared. They have the canine here." At 12:58 p.m., she texted: "Put the house phone on do not disturb."

At 1:02 p.m., Ortega texted: "K. We both took showers. What's happening?" At 1:03 p.m., she texted: "They have guns and helmets. We don't see the cop people on our block, but the cars." At 1:08 p.m., Ortega sent a text asking: "Does it look like people talked?" The following minute, she answered: "Yeah. They have undercovers. Stay quiet." At 1:12 p.m, Erica texted: "Just stay quiet. Did you guys put hands on gun?" Ortega answered: "No." At 1:19 p.m., Erica texted: "WTF did you shot [sic]? They're saying a little boy died." At 1:42 p.m., there was a call between Ortega's cell phone

---

4     "Wakka" was Joaquin's nickname.

number and his mother's. At 2:09 p.m., Ortega and Erica resumed texting. At 2:42 p.m., Ortega texted: "Wakka's in the closet. If I go outside, Wakka's staying in."

At 2:45 p.m, Ortega texted Joaquin: "They asking questions. I hear them." At 2:53 p.m. Ortega texted him: "They are talking to Bill the neighbor asking who lives with him and who lives in the apartment next to him." At that same time, Erica texted Ortega: "All I know is stay in the house, your guys room. Okay. Don't open the door for anyone." At 2:58 p.m., Ortega texted, "Can they search the house and stuff?" Erica texted: "Not without a warrant." At 2:59 p.m., Joaquin texted Ortega: "Foo [short for fool], if you open the door, they gonna bring the dog in to sniff our the [sic] house. Don't open it. Just stay low. You sure foo?" Ortega answered: "Yes, I'm sure foo."

At 3:23 p.m., Erica texted Ortega: "Delete your text messages K?" The next minute he texted back: "Erase all your texts now." At 3:31 p.m, Ortega texted Erica: "Did you tell Dad?" Two minutes later, she texted: "We tried telling him, but he knew what happened. He told Mom that we have to take you guys out of Pedro tonight. . . . You guys cnt [can't] stay in Pedro. They will lock you guys up. We are gonna take you to Gma Janet's." At 3:52 p.m, Joaquin texted Ortega: "Piss on the hat."[5] At 4:04 p.m., Erica texted Ortega: "You might think they did by [sic] they probably didn't. Just stay quiet and don't move. And delete all your text messages."

In addition, Kevin Yarborough, a Waterfront Piru gang member, testified Ortega had attacked him on April 23, 2008. He had never seen Ortega before that. Yarborough said he was walking with a cousin (Brandon Sandgren) toward Alma Market on 23rd Street and Alma when Ortega jumped out from behind a wall and lunged at him with a knife, stabbing him in the hand. Yarborough, who was six feet tall and weighed over 200 pounds at the time, took the knife from Ortega. He stabbed Ortega in the head to get

---

5    In Detective Rodriguez's experience, especially in homicide cases, suspects would attempt to mask a scent or destroy DNA evidence in this manner.

6

Ortega away from him. Yarborough was treated at the hospital and received stitches. He was told he needed surgery and had no feeling in the first two fingers and web of his right hand. At the time, he said, he thought it had either been an attempted robbery or "a racial thing" because of his "mixed" race, indicating "[b]asically, I'm Black. My mother is white." Later, he learned Ortega had problems with someone Yarborough knew. He believed Ortega had seen Yarborough before with this friend and then decided to take it out on Yarborough when he saw him alone.

Yarborough testified he had never met Alfaro, was not related to him and had not known who he was.

Nina Nance testified she had known Alfaro for life; he was like family and was "not at all" involved in any gang activity. He regularly stayed with Nance, her husband and their daughter and had spent the night at their house the night before he was killed. The next morning at around 10:00 a.m., he had asked to borrow Nance's phone to call his friend "Active" to "hang out and smoke some bud," meaning marijuana.[6] Because her phone would only work "on speaker," she heard their conversation. Alfaro referred to himself as "Batman," which was the name Alfaro had been called all his life, and "Active" recognized him. "Active" said he was on 30th Street and agreed to meet on 18th Street, saying he would call back first. About 15 minutes later, "Active" called back and said he had a ride. Alfaro said he would be right back and ran out the door. The phone was found on Alfaro's body, with some recent text messages. A 10:37 a.m. text from Alfaro to "Active" read: "Do you sell trees?" meaning marijuana. The reply read: "Yes." At 10:44 a.m., Alfaro texted: "Are you mobbing?" meaning walking. At 11:28 a.m., a final call came into Alfaro's phone from "Active."

---

[6]     On Ortega's cell phone, officers found video clips of him and Joaquin in which Joaquin referred to himself as "Active" and "Active Music." Both Ortega and Joaquin discussed selling marijuana in the videos.

In Ortega's defense, his mother Angelina testified a pediatrician diagnosed Ortega with a condition and prescribed medication for him when he was a child. He was "very hyper" and restless and not paying attention in class.

In late April 2008, she visited Ortega at the hospital after he was stabbed in his arm and head. When he came home from the hospital, he acted scared and nervous and had nightmares; he did not want to leave the house.

A forensic psychologist (Bruce Frumkin, Ph.D.) testified he had examined and administered testing to Ortega; he believed Ortega had symptoms consistent with what would be expected of someone with post-traumatic stress disorder (PTSD).

A neuropsychologist (Catherine Scarf, Ph.D.) testified she had prepared a report based on documentation she had received from Ortega's attorney, including arrest reports, medical documents, school discipline reports and Dr. Frumkin's psychological examination. She diagnosed him with ADHD along with "professional post-traumatic stress disorder, chronic and delayed." She said "professional" in this context "means it looks like that is what he has, but I'm not making that diagnosis. It's possible, it's probable, but it's not definitive." She said she found his intellectual functioning to be in the "borderline" range, just above "mental retardation," although she acknowledged a 3.0 average (which Ortega's high school records indicated) was not consistent with such an assessment. She acknowledged he was capable of planning and carrying out a murder.

A neurologist (Arthur Kowell, M.D.) examined Ortega and testified that various tests on Ortega's brain did not show any brain abnormality, but one test indicated "hypometabolism" in parts of Ortega's brain which could result from any type of infectious process or trauma, not only PTSD.

Another forensic psychiatrist (Ronald Markman, M.D.) testified he had reviewed psychological reports regarding Ortega and had spoken with him four times. One test suggested Ortega was exaggerating his condition. Markman diagnosed Ortega with PTSD, ADHD, marijuana abuse and personality disorders with aggressive and impulsive features.

8

In rebuttal, the prosecution presented the testimony of Detective Isidoro Rodriguez, recounting his interview (along with his partner) of Ortega on the night of his arrest.[7] The interview lasted about three hours, including breaks. Detective Rodriguez testified Ortega had dot tattoos on his fingers signifying "13," for the 13th letter of the English alphabet, referring to the Mexican Mafia and the "Surenos" or "Southerners." Ortega said he was from Victoria Park, a gang in Carson and aligned with the Surenos and Mexican Mafia. He said his moniker was "Playboy Castro" because he had four children with different mothers and admired the Cuban dictator and wanted to emulate the way he used his mind and dealt with people, implying he had a similar intellect. He did not discuss any trauma or psychological suffering. He was very reluctant to provide details but gave "bits and pieces," enough to confirm he was involved. A videotape of Ortega's interview conducted by Detective Rodriguez and his partner Detective Batres was played for the jury, and jurors had a transcript of the interview.

When Detectives Rodriguez and Batres concluded their interview, Detective Cortez was asked to book Ortega and take him to another room so Detectives Rodriguez and Batres could interview Joaquin without the two brothers crossing paths. Detective Cortez interviewed Ortega further at that time, and the videotape of that interview was played for the jury. Ortega said he was stabbed in 2008 during a fight with two Waterfront Piru gang members, twins David and Danny, who had tried to kill Joaquin as they thought he was in a rival gang. He said he thought Alfaro was the cousin of the person who stabbed him and wanted revenge.[8]

---

[7]     The trial court conducted a pretrial evidentiary hearing pursuant to Evidence Code section 402. After hearing testimony presented by both prosecution and defense witnesses, the trial court ruled Ortega's statements were voluntary and admissible.

[8]     Alfaro's father testified Alfaro had no Black or African-American relatives named David or Danny who might be twins. He was not related to Kevin Yarborough or Brandon Sandgren either.

He said Alfaro, identifying himself as "Batman," called Joaquin to buy marijuana. Joaquin and Alfaro had met "randomly" a month earlier, but Alfaro had not recognized Joaquin. Joaquin thought Alfaro was the cousin of the person who stabbed Ortega. Ortega heard the phone call and told Joaquin to meet with Alfaro. Ortega got a gun and accompanied Joaquin, intending to shoot Alfaro as revenge for being stabbed. He said he was "drunk with rage." Joaquin told him to let it go, but Ortega would not listen.

When Joaquin and Alfaro met at the agreed corner, Ortega ran up and shot him. He said, "I couldn't stop myself." When Alfaro ran, Ortega chased him and shot him again. He said Alfaro reached into his pocket so he thought he was going to shoot Joaquin but acknowledged he intended to shoot Alfaro when he saw him. He said Joaquin picked up the expended shell casings. He didn't know how he cut his hand.

The prosecution's gang expert, LAPD Officer William Peck, described gang culture and activities, noting "payback" occurred when a rival gang member victimized a gang member of another gang. The gang member could then target any member of the rival gang—not only the gang member who attacked him.

In addition, Dr. Kaushal Sharma, a forensic psychiatrist, testified he had interviewed Ortega twice and had reviewed reports relating to his psychological examinations. According to Dr. Sharma, the PET scan revealed only that Ortega's results were consistent with a diagnosis of PTSD as well as many other conditions; it did not indicate Ortega had PTSD. In Dr. Sharma's view, Ortega had some symptoms of PTSD from the 2008 incident but did not meet the criteria for diagnosis. To the contrary, many facts contradicted such a diagnosis. In particular, he noted, a person with PTSD would typically avoid a hostile situation and would not set up a revenge killing and confront someone in a rival gang area.

The jury found Ortega guilty of first degree murder and found true the special circumstance and firearm allegations.

10

The trial court sentenced Ortega to a state prison term of life without the possibility of parole, plus a consecutive term of 25 years to life for the firearm enhancement.

Ortega appeals.

## *DISCUSSION*

**I.** **Ortega's Voluntary Statements to Police Were Not the Product of Psychological Coercion.**

Ortega acknowledges he was advised of his right to remain silent and chose to speak with detectives but says his confession was the product of psychological coercion and thus involuntary so it should have been suppressed. We disagree.

*A. Standard of Review and Applicable Law.*

When a defendant challenges the voluntariness of a confession on appeal, we review independently the trial court's legal determination of voluntariness. (*People v. Williams* (1997) 16 Cal.4th 635, 659.) We review for substantial evidence any factual findings regarding the surrounding circumstances of the confession. (*Id*. at p. 660.)

The Constitution limits the prosecution's use of a defendant's involuntary confession. The burden rests with the prosecution to establish, by a preponderance of the evidence, that the confession was voluntary. (*People v. Williams* (2010) 49 Cal.4th 405, 436.) The "question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" (*People v. Hogan* (1982) 31 Cal.3d 815, 841, disapproved on other grounds by *People v. Cooper* (1991) 53 Cal.3d 771, 836.) No single criterion is dispositive to prove voluntariness. (*People v. Williams, supra*, 49 Cal.4th at p. 436.) Rather, a court must closely examine the facts of the case and assess "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation"—to determine if a suspect's will was overborne. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

11

In considering the characteristics of the accused, the court may weigh his or her education, maturity, sophistication, prior experience with the criminal justice system, and emotional state. (*People v. Williams, supra*, 16 Cal.4th at p. 660; *In re Shawn D*. (1993) 20 Cal.App.4th 200, 209.) Our Supreme Court has disapproved of police tactics specifically "calculated to exploit a particular psychological vulnerability of defendant" (*People v. Kelly* (1990) 51 Cal.3d 931, 953) or his emotional state (*People v. Hogan, supra,* 31 Cal.3d at pp. 841-843).

Police may use deceptive tactics, but a reviewing court will consider the impact of those tactics in determining the voluntariness of an ensuing confession. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1241.) "So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280, original italics, citation omitted.) The use of false forensic evidence as a subterfuge is permitted when such tactics are not likely to result in a false confession. (See *People v. Farnam* (2002) 28 Cal.4th 107, 182 [fabricated evidence of fingerprints on a wallet alone not of type reasonably likely to procure an untrue confession]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [false claims that police had found soil samples, car tracks and rope fibers connecting suspect to murder did not invalidate confession]; *People v. Mays* (2009) 174 Cal.App.4th 156, 166 [fake polygraph examination was not likely to produce false confession when the defendant asked for the exam].)

However, the police may not elicit a confession by an express or implied promise of leniency to the accused, if the promise is a motivating cause of the accused's decision to confess. (*People v. Williams, supra*, 16 Cal.4th at pp. 660-661.) While "[t]he line between a threat (or a promise) and a statement of fact or intention can be a fine one" (*People v. Thompson, supra*, 50 Cal.3d at p. 169), mere advice or exhortation by the police that the accused would be better served to tell the truth is not alone a promise of leniency. (*People v. Tully* (2012) 54 Cal.4th 952, 993, citing *People v. Jimenez* (1978) 21 Cal.3d 595, 611.)

*B. Ortega's Claim of Psychological Coercion.*

On November 23, 2009, Ortega was first interviewed by Detectives Rodriguez and Batres from 1:07 a.m. to 3:58 a.m. Then he was interviewed by Detective Cortez from 4:10 a.m. to 5:09 a.m. Initially, he says, he denied any involvement in the shooting, but after the detectives made threatening statements that charges could be brought against his brother, sister and mother for their involvement, he admitted to shooting Alfaro but gave little or no other information about the incident to Detectives Rodriguez or Batres, but they continued to use psychological coercion on him, trying to induce a full confession. After Detectives Rodriguez and Batres ceased their interview, he says, Detective Cortez reinitiated the interview after gaining Ortega's confidence after claiming to have known his father who was in prison. After that exchange, he says, he broke down and agreed to give a full videotaped confession, explaining how he and Joaquin set up a meeting with Alfaro, with Alfaro thinking he would be buying marijuana from Joaquin, and how Ortega ran at Alfaro and shot him as revenge for being stabbed by Alfaro's cousin in 2008.

At the pretrial hearing regarding the voluntariness of Ortega's statements, Detective Rodriguez acknowledged that he may have said Ortega was "throwing his brother under the bus" if he did not tell what had happened and later stood up and yelled in Ortega's face he was a "fucking loser."[9] He also threatened to call Ortega's mother and bring her to jail. Moreover, Detective Cortez told Ortega he knew Ortega's father, and he was an honest man; Ortega should be like his father and tell the truth, but Detective Cortez lied about knowing his father.

Richard Leo, J.D., Ph.D., a law professor at the University of San Francisco and expert in police interrogation, said the detectives used some non-coercive techniques,

---

[9] Initially, Ortega said he had shot Alfaro just once. Detectives told Ortega they knew Alfaro was shot twice, Joaquin was there and they had both handled the gun. If he insisted he only shot once, he was saying Joaquin shot Alfaro too.

including accusation, confrontation with evidence, repetition, raising of the voice, cutting off denials and insults, but they also used psychologically coercive techniques. For example, detectives told him if he was admitting the shooting without giving a reason, he would be seen as a cold-blooded killer, implying he would be prosecuted for a higher crime and go to prison for a longer time, but if he gave an admission, it could be seen as self-defense, with a lesser punishment. In addition, detectives seized on Ortega's fear Joaquin would be prosecuted, telling him Joaquin had given a more detailed confession and could face greater punishment. Dr. Leo said psychological coercion and threats against Joaquin were ultimately the motivation for Ortega's explanation of the shooting.

Dr. Leo also acknowledged, however, the fact the detectives confronted Ortega with overwhelming eyewitness, blood and gun evidence could have influenced Ortega's decision to admit what he had done. He also acknowledged the statements regarding Joaquin may have been true but said it was unnecessary to threaten Ortega with the truth.

Noting Dr. Leo seemed to see coercion no matter what the police did, having viewed the videotaped interviews and hearing testimony, the trial court found Ortega had knowingly, intelligently, voluntarily, expressly and explicitly waived his rights and made the recorded statements. Ortega was engaging and very articulate and chose to disengage during the first interview. During the second interview, he was articulate and remorseful in explaining the circumstances of the shooting. The trial court found no coercive police conduct, psychological or otherwise, to suggest Ortega was forced to make a false confession; to the contrary, the detectives were appropriate and professional. Therefore, the trial court rejected Ortega's motion to suppress his confession.

*C. Substantial Evidence of Voluntariness.*

Substantial evidence supports the trial court's determination Ortega's statements were voluntary and were not the product of psychological coercion. Initially, Ortega was forthcoming about himself, admitting his gang membership and telling how he got his moniker (Playboy Castro), discussing his four children and their mothers at length and talking about how close he was with his mother, sister and brother. Detective Rodriguez noted Ortega's dad was from Victoria Park (Ortega's gang), and when Ortega asked,

14

"You guys know my dad?" Rodriguez said they did. Asked about the scar on his head, he told detectives someone had tried to kill him two weeks before his birthday the year before and discussed that incident at length. He said he passed out and was taken to the hospital but said he did not cooperate with police at the time so nothing ever happened. Asked if he found out who had attacked him, he said, "Never. I really don't . . . . I wish I never . . . . I don't ever want to find out you know? Because like I'm here now and so, I'll move on and I'll forget about it you know. I still have these [pointing to his scars] to think of . . . but as far as them I don't care."

Asked about the bloody cut on the web of his right hand, however, he said he was "just messing around at his house" when he cut it. He didn't know how, but for some reason his hand just busted open. Detectives told him they knew how he got the cut. They had been working all day already. Then Ortega said he knew they were talking about the gunshots but said he was at home. Detective Rodriguez said, "No, we want the truth." Ortega continued saying he had been home, watching TV, heard the cops come and "was like 'what the hell?'" and opened the door. Detective Rodriguez told Ortega he knew that was not the truth. "[W]e talked about it to a lot of people. We even talked about it with your sister, to your mom, and we know what really happened. . . . We know you were involved in something." He said there were always two sides to every story, and asked what had happened on that street. Ortega continued to insist nothing had happened.

Detective Rodriguez explained how the police investigation led to Ortega's door and asked for his side of the story "[b]ecause right now you're just looking like you're just a cold-blooded person." He went on to explain how he had talked to Erica and his mom already and knew about the conversation Ortega had had with Erica while their mother was crying. He said he knew about all of the text messages back and forth, and his mother was "borderline being in trouble for covering up." Ortega said his mother had nothing to do with it, and Detective Rodriguez said he knew that, but said "you're causing problems for your brother, for your family" so he needed to tell the truth. He detailed all the evidence and eyewitnesses against Ortega. "We need to know the truth

15

because, again, depending on what happened between you and this other boy, makes a big difference." Ortega said, "I mean, I don't want to get you guys mad or nothing."

Detective Rodriguez said, "No no no." He said he and his partner wanted to do a thorough investigation and wanted to hear his side of the story. He said he could tell Ortega was not a bad guy, they had talked about his children and he had a good heart, but something happened "that maybe you didn't intend to do. I don't know." He said Ortega needed to find it in his heart to stand up and be the man he is, set a good example for his kids, his brother, his mother. He told Ortega it was very hard for his mother and his sister to be honest with the police, they felt they needed to lie to protect him and he knew Ortega wouldn't want them to do that, but for the sake of the family they were honest. Now it was his turn "to come forward and say you know what, I made a decision today. It wasn't a good decision, but I made that decision and I'm going to have to live with it. So this is your opportunity to tell us what happened."

Then Ortega said he had been walking in the alley when he saw a guy walk up and he was reaching in his pocket and pointed at Ortega so he shot him—once. He repeatedly insisted he had shot him "only once." He guessed his brother saw him when he was walking home. He said it was "just luck" that he happened to have a shotgun with him. He said he found it in a dumpster with everything he needed. Detective Rodriguez continued to tell Ortega he needed to tell the truth. He said, "What happened today is a result of what happened to you." Ortega said, "No, this? This is not, no it's not. This is a completely different thing." Detective Rodriguez said, "There is overwhelming evidence, there's witnesses, there's your blood evidence, people saw you with the weapon and they saw your brother. So that's not the question. I want to hear from you exactly what happened and where did this start?"

It continued on like this. When Detective Rodriguez asked Ortega how he was carrying the shotgun, Ortega said he was just walking with it outside where everybody could see it. Detective Rodriguez told Ortega they had also recovered the evidence from his room. He said he knew enough about Joaquin's involvement and everything pointed to his involvement, so Ortega would have to tell what happened if he wanted him to

16

believe otherwise—Ortega shot once and Joaquin shot once or Ortega shot twice. Then Ortega said he shot twice. He was asked what the guy had said. Ortega said, "Nothing." Detective Rodriguez again told Ortega, "[w]e have witnesses." "[H]e's begging for his life . . . ." Detective Batres then asked, "Why this guy? . . . [T]his guy did not have a weapon on him  There's obviously a reason . . . .  [T]ell me what that reason is. I want to believe you[,] Albert." Ortega answered, "There is no reason."

Later, he said the guy got killed because Ortega thought he had something, but Detective Batres said, "But he didn't have anything. And you know he didn't have anything. And once he ran away from you, you chased after him. . . .  [Y]ou still run after him down the alley into the street and you shoot him as he's there on the ground, begging for his life and you shoot him and you want me to sit here and believe that you're scared of this guy?  . . .  Does that make sense to you?" "No," Ortega said. Detective Batres asked, "What made you so angry today?" Ortega answered, "I don't know. I don't know." He denied it had anything to do with what had happened to him.

"[Y]ou chase him and you execute him in the middle of the street. How'd you feel at that time when that happened?" Detective Batres asked. "Not good," he replied. He continued to deny Joaquin's involvement, but the detectives knew Joaquin had picked up the shells and helped him. "But you're the one that started this whole thing." Ortega continued to deny any connection to what had happened to him in the past. Then he said he thought the guy he killed that day was "the guy that stabbed [him]." The detectives said they knew from Erica about the phone call to buy some "dope." The detectives suggested Ortega was trying to protect his brother over a deal gone bad, but there were two masks, two pairs of gloves, they were acting together.

After a break in the interview, Ortega was asked whether he was doing all right with water and said, "Yeah, I'm cool." He had even "cuffed" himself "[s]o you guys don't think I was going to leave." (They uncuffed him.) Detective Rodriguez said he could tell Ortega was at the point where he wanted to tell them the whole thing, and they clearly knew it was the result of something that happened in the past, but what Ortega was saying did not match the witnesses' accounts. Detective Rodriguez said Ortega did

17

not seem like a bad person and asked him to fill in the gaps.

Ortega then said, "I know you guys aren't going to like it but like just want to keep it like that." He was told it was not about making the police happy; it was the "right thing to do . . . to help Albert be an honest person again." He was told his mother had said, "[T]ell my son I love him, tell him that I didn't make him to be a bad person. He's an honest man[,] detectives. Just tell him to be honest."

Asked why he would not say anything, Ortega said, "You guys already have the pieces to everything." Detectives showed him a picture of Alfaro. "What do you feel when you see his picture[?]" "It's unexplainable." Detective Rodriguez asked, "You think what you did today was right?" "No," he replied. The detective told him, "Your mom asked us to let her know why. . . . She didn't raise you to be a person like this. She didn't want you to end up like your father. That's why we know about your dad. That's the last thing, when she went to church today, that's the last thing she would have ever dreamed of." "Ya," he said. He said he didn't know why he was angry that day. Asked if he shot Alfaro because he recognized him, Ortega said "Yes," but asked how he recognized him, Ortega again said, "I don't know."

Detective Rodriguez said he had heard Ortega's father was writing to him from prison, trying to keep him straight. Ortega said, "Yeah, telling me to take care of the babies and stuff." The detective said Joaquin was being interviewed and he said he (Joaquin) had done everything. He said they were going to conclude the interview with Ortega, so he had one last opportunity to tell what had happened. He moved like he was about to talk, and Detective Rodriguez said, "[Y]ou're about to say it, what[?]" He said he didn't know, nothing happened. "I guess it's the end so. . . ." Detective Rodriguez told him he would feel relief when the truth was out and he was honest with himself, and Ortega took a deep breath, but went back to saying he didn't know about anything. "I guess that's how it is." Detectives urged Ortega to be honest, told Ortega they knew from Erica and Joaquin about an earlier incident at the bus stop, but Ortega denied any knowledge.

Ortega said he was afraid of his brother "go[ing] down for something he didn't do." The detectives said they could not help Joaquin without Ortega's help by telling the truth. They asked again what had happened, and Ortega said he didn't know. At that point, Detective Rodriguez said he was going to call Ortega's mother and tell her the true killer was a liar and a "fuckin[g] loser, right? You shot a guy for no reason. . . a cold blooded killer, because that's what you told me. Is that what you are? Is that what you did? We've been here patient, we've been polite to you, we respected you—"

"Yes, sir–" Ortega acknowledged.

Later, after Detective Rodriguez left the room, Ortega told Detective Batres, "I'm sorry, I don't know what to say." Detective Batres told him, "Apologize to yourself. Don't apologize to me." He said he and his partner both had kids Ortega's age so "this is tough for us, [w]hen we see stuff like this." Detective Rodriguez "gets upset when he sees kids like yourself throwing their life away." Ortega said he didn't know what to say. Detective Batres said, "I was hoping that you would tell the truth. That's all I was hoping." When Detective Batres said he was about to walk out and asked if that was what Ortega wanted, Ortega said, "I didn't, I mean, I don't, I mean, I know like I'm already done you know, so." Detective Batres said he was not done; he should be done when he knew the whole truth was out and he had done all he could to help himself and his brother. He asked Ortega if he knew his mother had tried to contact his uncle to try to cover up for him and Joaquin. She was willing to put other people into the mix because that was how much she loves him. Detective Batres said he wished it could have been different. Ortega was photographed, cuffed and taken for booking. Detective Batres asked if he could take a swab from the inside of Ortega's mouth for DNA testing, but Ortega refused.

After that, Ortega spoke with Detective Cortez who said he read the Bible and believed "the truth is the most important thing." Ortega went on to tell Detective Cortez about his stabbing and how, "since that day [he] was . . . drunk with revenge. . . ." A "couple months ago," Joaquin said he had seen a guy he thought was the cousin of the guy that almost "got" him when he was stabbed two weeks before his birthday the year

19

before. Before that, three guys had "banged" on Joaquin at a bus stop. A couple of weeks later, they caught Joaquin "slipping" at Alma Park and Ortega took the bus over from work and got stabbed and that was the "start" of everything that had happened earlier that day.

Then Joaquin ran into "Batman," which was "the kid from today," and he did not recognize Joaquin. The two talked about smoking "bud" and exchanged numbers. When Joaquin called, Ortega told Joaquin to arrange the meeting at 18th and Cabrillo where he shot Alfaro. Ortega said, "I wish it wouldn't have take[n] over me. . . . Because of all this. There's no excuse for taking someone's life." Before he shot Alfaro, Ortega said, "my heart was telling me not to and I was shaking, shaking like don't do it, just leave it, you're alive, just leave it alone. And then for some reason I just—I don't know, man. I just . . . couldn't stop myself. . . ." He thought about what had happened to him, about his anger, his revenge.

He said Joaquin did not want to set Alfaro up, but Ortega said "just do it, this is the only chance we got[,] man." Ortega knew Alfaro was not there the day he was stabbed, he said, but he "just wanted to do him for revenge."

At the conclusion of the interview, Detective Cortez said he appreciated Ortega telling him the truth, "[m]an to man," but asked why Ortega decided to talk to him when he had not told the other detectives the truth. Ortega said, "Just the way you are man. Weird coincidence you know my dad and you talked to my sister and my mom. . . . The words that you were saying sunk in to my head and said snap out of it fucker. And that's why I told you all that." He said he felt Detective Cortez had treated him fairly and did not try to force him. "Hell no. I'll vouch for that." Asked if he was hungry or thirsty, Ortega said he was not.

Reviewing the totality of the circumstances, we conclude Ortega's will was not overborne through psychological coercion or police deception. "Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite, supra,* 17 Cal.4th at p. 1240; *People v. Chutan, supra,* 72 Cal.App.4th at p. 1280 ["Police trickery

20

that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause[s]"].) Unless the police conduct coerces a suspect into making a confession, the confession is not considered involuntary. (*Ibid.*; *People v. Jones* (1998) 17 Cal.4th 279, 297-298.) Thus, "[s]o long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence." (*People v. Chutan, supra*, 72 Cal.App.4th at p. 1280, and cases cited therein.) There must be a proximate causal connection between the deception and the confession, which must be more than "'but for'" causation-in-fact. (*People v. Musselwhite, supra*, 17 Cal.4th at p. 1240.)

In *People v. Musselwhite, supra*, 17 Cal.4th 1216, police detectives falsely told a murder suspect his fingerprints had been lifted from the murder victim's neck. The court held the defendant's subsequent confession admissible, reasoning that the deception "f[e]ll short of what is required to make out a case of prejudicial deception . . . . it does not follow that telling a murder suspect in the course of questioning that his prints had been lifted from the neck of the homicide victim caused him to confess. The link between inducement and statement . . . falls short of being 'proximate.'" (*Id.* at p. 1241.)

In *People v. Thompson, supra,* 50 Cal.3d 134, a detective falsely told a murder suspect that his tire tracks and his car had been linked to the place the victim's body was found, a trunk he had carried in his car contained physical evidence linked to the victim, and certain rope fibers had been found in his bedroom. (*Id.* at pp. 160-161, 167.) The detective also told the suspect that he did not believe the suspect killed the victim intentionally, but if the suspect did not talk, the detective would proceed on a theory of intentional killing. (*Id.* at pp. 169-170.) The court held these facts were insufficient to demonstrate the confession was involuntary. (*Id.* at pp. 167, 170; accord, *People v. Jones, supra*, 17 Cal.4th at p. 299 [detective's act of implying he "could prove more than he could" was permissible, since it was not reasonably likely to procure an untrue statement]; *People v. Chutan, supra*, 72 Cal.App.4th at p. 1280, and cases therein [police are free to use "deceptive stratagems" to trick a guilty person into confessing].)

21

Ortega claims the detectives threatened and lied to him and his resulting statement was coerced.  However, "subterfuge is not necessarily coercive in nature."  (*People v. Chutan, supra,* 72 Cal.App.4th at p. 1280.)  He says he broke down and told Detective Cortez the truth because Detective Cortez lied and said he knew Ortega's father, but early in the first interview, Detective Rodriguez told Ortega he knew his father but Ortega was unwilling to say what had happened then.  Moreover, statements Ortega calls threats were a combination of true statements and exhortations to tell the truth.  The detectives told Ortega several times that he was being given an opportunity at that moment to tell the truth but that he might not be given another.  The detectives did not suggest to Ortega that he could avoid punishment by telling them what actually happened; to the contrary, they made it clear they already had overwhelming evidence against him.  The detectives truthfully stated that what had happened between Ortega and Alfaro that day could make a difference—depending what had happened, and counsel to tell the truth is not an implied promise of leniency.  (*People v. Tully, supra,* 54 Cal.4th at p. 993.)

Furthermore, as our Supreme Court stated in *People v. Jones, supra*, 17 Cal.4th at pages 297-298, "[t]he business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means.  '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.]  'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'  [Citation.]"

Here, the circumstances surrounding Ortega's statements to police do not constitute "prejudicial deception."  (*People v. Musselwhite, supra*, 17 Cal.4th at p. 1241.)  Rather, the detectives were impressing upon Ortega the overwhelming evidence against him and urged him to tell the truth. "[W]hen law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises."  (*People v. Carrington* (2009) 47 Cal.4th 145, 172.)  The circumstances in this case do not suggest a coercive

22

atmosphere likely to produce an involuntary and unreliable statement. (*People v. Jones, supra,* 17 Cal.4th at p. 298.) We find no error.

**II.** **We Reject Ortega's Claim that California's Death Penalty Violates the Eighth Amendment Because the "Proliferation of Special Circumstances Has Undermined the Narrowing Function Required of California Law."**

Ortega says he would have been eligible for the death penalty if the prosecution had elected to seek it, and pursuant to section 190.2, subdivision (a)(15), the jury was only required to find he intentionally killed his victim by means of lying in wait in order to find the special circumstance true. Citing *People v. Estrada* (1995) 11 Cal.4th 568, 575-576, he says Eighth Amendment standards apply to all allegations of special circumstances, regardless of whether the People seek and exact the death penalty or a sentence of life without parole.

As he concedes in his reply brief, however, our Supreme Court has expressly rejected numerous similar claims on the merits. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1174, citing *People v. Lewis* (2008) 43 Cal.4th 415, 515-516 [defendant contends the lying-in-wait special circumstance unconstitutionally fails to provide a meaningful basis for distinguishing between capital and noncapital cases; "[w]e have repeatedly rejected the facial challenge and see no reason to depart from those holdings"]; *People v. Carasi* (2008) 44 Cal.4th 1263, 1310 [the lying-in-wait special circumstance is not unconstitutionally broad as it is "limited to intentional murders that involve a concealment of purpose and a meaningful period of watching and waiting for an opportune time to attack, followed by a surprise lethal attack on an unsuspecting victim from a position of advantage"]; *People v. Stevens* (2007) 41 Cal.4th 182, 203-204.) Accordingly, we reject Ortega's claim as well.

**III.** **Ortega's Sentence Does Not Constitute Cruel or Unusual Punishment.**

Ortega says his state prison sentence of life without the possibility of parole is unconstitutional under the Eighth Amendment of the United States Constitution and

article I, section 17 of the California Constitution because it is grossly disproportionate to his crime. We disagree.

First, because Ortega failed to raise this issue in the trial court, he has forfeited this claim. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 250 [constitutional objections not properly raised are forfeited]; see also *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8 [forfeiture of claim of cruel and unusual punishment].)

Furthermore, Ortega's claim fails on the merits. The imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution (*People v. Young* (1992) 11 Cal.App.4th 1299, 1308-1311) or the federal Constitution. (*Harmelin v. Michigan* (1991) 501 U.S. 957 [sentence of life without possibility of parole not cruel and unusual for possession of 672 grams of cocaine].)

Ortega concedes successful proportionality challenges in noncapital cases such as his are "'exceedingly rare,'" but nevertheless compares his case with *Edmund v. Florida* (1982) 458 U.S. 782, 790-791, in which the Supreme Court found the death penalty to be disproportionate under the Eighth Amendment for the driver of the getaway car in an armed robbery of a dwelling; there was no evidence the driver, who was not present at the crime scene, killed or attempted to kill or intended or contemplated a life would be taken. (*Id.* at p. 801; *Tison v. Arizona* (1987) 481 U.S. 137, 149 [discussing *Edmund*].) Ortega, however, planned and executed Alfaro's murder. He told his brother to set up a meeting with Alfaro, who thought he was going to meet Joaquin to "hang out and smoke some bud." Instead, Ortega used Joaquin to lure Alfaro to a place where Ortega, waiting with a shotgun, could and did run up on Alfaro and ambush him, as revenge for Ortega's stabbing by someone Alfaro did not know two years in the past. After Ortega shot him once, Alfaro was pleading for his life. Ortega responded by fatally shooting Alfaro in the back at very close range, severing his spinal cord and puncturing his aorta and lung. Given Ortega's role in his crime (and his sentence of life without possibility of parole,

24

not death), Ortega's reliance on *Edmund v. Florida, supra,* 458 U.S. 782, is unavailing.[10]

Likewise, in challenging a sentence under the cruel and unusual punishment provision of the California Constitution, a defendant must overcome a considerable burden. (*People v. Wingo* (1975) 14 Cal.3d 169, 174; *People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630.) *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*) identified three factors for the reviewing court to consider in assessing this constitutional claim: (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions. (*Lynch, supra*, 8 Cal.3d at pp. 425-427.)

"The three prongs of *Lynch* are not absolute rules establishing that a given punishment is cruel and unusual, but are merely guidelines to be used in testing the validity of a particular penalty. [Citations.] The importance of each prong depends on the specific facts of each case and application of the first prong alone may suffice in determining whether a punishment is cruel and unusual." (*In re Debeque* (1989) 212 Cal.App.3d 241, 249.) "The major yardstick . . . in determining whether a punishment is cruel and unusual under the facts of a case, is whether it is 'out of all proportion to the offense . . .' [citations] so as to shock the conscience and offend fundamental notions of human dignity." (*Ibid.,* citing *Lynch, supra,* 8 Cal.3d at p. 424.) The defendant bears the burden of establishing his or her sentence is greater than that for more serious offenses in California, and that similar offenses in other states do not carry punishments as severe. (*People v. Wingo, supra,* 14 Cal.3d at pp. 174-175; *Lynch, supra,* 8 Cal.3d at pp. 427-429; *People v. Ruiz* (1996) 44 Cal.App.4th 1653, 1665.)

---

10    Similarly, we reject Ortega's reliance on *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2469] in which our Supreme Court held the Eighth Amendment precludes a sentencing scheme mandating life in prison without possibility of parole for juveniles convicted of homicide. Ortega was an adult (21 years old) when he murdered Alfaro.

25

Here, Ortega planned Alfaro's execution by ambush, using the pretext of a marijuana sale, and fatally shot an unarmed Alfaro at very close range in broad daylight in the middle of the street as revenge although Alfaro did not stab Ortega and apparently did not know the person who did. The extreme circumstances of Ortega's crime justify the severity of his sentence, and he has made no attempt to otherwise compare his sentence with that for more serious in-state offenses or for similar offenses in other states. Because he has failed to show his case is that "'exquisite rarity'" where his punishment offends fundamental notions of human dignity or shocks the conscience (*People v. Kinsey, supra,* 40 Cal.App.4th at p. 1631, citation omitted), Ortega's cruel and unusual punishment claim fails.

## IV. *The Section 1464 Penalty Assessment Is Properly Stricken.*

Ortega says the trial court's imposition of a $1,000 penalty assessment and surcharge pursuant to section 1464 and Government Code section 76000 is unauthorized and must be stricken. The People agree.

At sentencing, the trial court properly imposed a $10,000 restitution fine pursuant to section 1202.4, a $40 court security charge under section 1465.8, subdivision (a)(1) and a $30 conviction assessment fee pursuant to Government Code section 70373. The court also imposed "a $1,000 assessment and surcharge required by . . . section 1464 and Government Code section 7600[0]."

Section 1464, subdivision (a)(1), and Government Code section 76000, subdivision (a)(1), each provide that a state penalty shall be levied upon every fine. However, both sections also expressly provide the penalty does not apply to any penalty authorized by the other. (§ 1464, subd. (a)(3)(B); Gov. Code, § 76000, subd. (a)(3)(A).) Section 1202.4, subdivision (e), provides the "restitution fine shall not be subject to penalty assessments authorized in Section 1464 [or Government Code, section 76000] . . . ." (*People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1110; *People v. McHenry* (2000) 77 Cal.App.4th 730, 734.) In addition, the court security fee and conviction assessment fine are expressly excluded from the penalty assessments specified in section 1464 and Government Code section 76000. (§ 1465.8, subd. (b); Gov. Code, § 70373,

26

subd. (b).) Consequently, any assessment under section 1464 or Government Code section 76000 is properly stricken.

## V.      The Parole Revocation Fine Is Properly Stricken.

In addition to the fees, fines and assessments summarized in the preceding section, the trial court imposed and stayed a parole revocation fine in the amount of $10,000 pursuant to section 1202.45.[11]  Ortega argues and the People concede this fine was unauthorized and is properly stricken.

Because Ortega was sentenced to life in prison without possibility of parole, the parole revocation fine is improper.  (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181-1185; see also *People v. Jenkins*  (2006) 140 Cal.App.4th 805. 819; *People v. Petznick* (2003) 114 Cal.App.4th 663, 687.)  Accordingly, the abstract of judgment should be corrected to strike the parole revocation fine pursuant to section 1202.45.

### *DISPOSITION*

The judgment is modified to (1) strike the penalty assessment pursuant to section 1464 and (2) strike the parole revocation fine pursuant to section 1202.45.  As modified, the judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                                              **JACKSON, J.**

[11]     Pursuant to section 1202.45, in "every case where a person is convicted of a crime and [whose] sentence includes a period of parole, the court shall . . . assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."

27