Filed 8/8/14  P. v. Melendez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OMAR MEJIA MELENDEZ,<br><br>        Defendant and Appellant. | A140048<br><br>(San Mateo County<br>Super. Ct. No. SC076673A) |

In this matter we are asked to review the trial court's ruling on the admission of statements made by defendant to police.  Defendant challenges the statements based on violations of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and voluntariness.  We have reviewed the challenged interrogation in this instance and, like the trial court, we find no violation of defendant's rights under either principle.  We therefore affirm.

**STATEMENT OF THE CASE**

On August 29, 2013, a jury found defendant guilty of 24 counts of lewd and lascivious conduct with a child under 14 years of age. (Pen. Code, § 288, subd. (a).)  On October 16, 2013, the trial court sentenced defendant to 24 years in state prison.  Defendant timely appealed.

**STATEMENT OF FACTS**

During 2009, after coming to the United States from Honduras, defendant moved into the home of his cousin, U., and his cousin's family in Daly City, California.  At the time, U. was married to Mrs. C., and they had two children, C.C. and D.C.  The youngest,

1

D.C., was born in April 2001 and she was nine years old when defendant began to live with the family.

Defendant lived in this home for approximately two years. Mrs. C. worked at her job three days a week and U. worked seven days a week. During this two-year period, defendant would often watch the two children after school while the parents were at work. At no time did Mrs. C. observe any inappropriate behavior between defendant and D.C., nor did the mother note her daughter was uncomfortable when defendant was also present.

A short time after defendant began living in the home, he showed to D.C. a video on his cell phone in which a naked man and woman have sexual relations. D.C. mentioned this event to her parents. U. confronted defendant and asked to review the cell phone, but the father saw no such film on the device. Shortly after this incident, defendant began to fondle and touch D.C. when she came home from school. As D.C. related, he would touch her in any place he wanted, including her breasts and vagina. Sometimes, defendant would invite both D.C. and C.C. into his bedroom so he could play with the children with the lights turned off. He indicated he had hidden money in the room and they should try finding it in the dark. While the two children searched the darkened room, defendant would fondle D.C. in her private areas under her clothing. This conduct made D.C. feel very uncomfortable.

In addition, there were times when defendant would kiss D.C. on the mouth and suck on her breasts when the two were alone in his room. The sucking caused discomfort to the minor. She also disliked kissing defendant.

On at least one occasion, C.C., while playing the "look for money" game in the dark, heard the sound of defendant kissing D.C. on the mouth. The boy told one of his uncles about this and the uncle asked D.C. what was happening in defendant's room. The uncle accused D.C. of allowing defendant to kiss her.

2

On the stand, D.C. related a specific incident when defendant actually touched her vagina in her bedroom. It was during the morning and defendant stood over her while she was in bed. He put his finger inside her pajamas and then began to touch her vaginal area. She also related another time defendant exposed his penis to her as he and the minor were in bed together. She actually touched his penis as she tried to move away.

Over time, defendant would pull D.C. by the waist towards him and cover her mouth as she tried to move away from him. Altogether, D.C. believed defendant engaged in inappropriate touching of her private area once or twice a week while she attended the third grade. The parts of her body defendant touched would be different from time to time. She did ask him to stop.

The minor did not tell her mother about these acts because she "never thought of it." D.C. did tell her close friend Ana. She did this because Ana had told the minor she was also touched by a man. D.C. told Ana about her own experiences because she did not want Ana to think she was the only one being harmed this way. Ana alerted the police about what was happening to D.C. They came to D.C.'s home and spoke with her. The minor also spoke with Detective Ron Harrison at the Keller Center and admitted defendant touched her vagina two or three times. After telling Harrison about these acts, D.C. felt much better.

Detective Harrison spoke with D.C. at the Keller Center when the girl was 11 years old. She told the detective the events happened very regularly with occasional, but not prolonged, intervals. There were gaps of a few days but not anything longer. These incidents happened any day during the school week. After speaking with D.C. at the Keller Center, he had Mrs. C. make a phone call to defendant about some of D.C.'s comments. However, defendant made no admissions.

The prosecution also presented the detailed testimony of expert witness Miriam Wolf. She is employed as a licensed clinical social worker and forensic interview specialist at the Keller Center in the San Mateo Medical Center. She handles the victims

3

of child sexual abuse.  She was presented as an expert on child sexual abuse accommodation syndrome as it is developed in scientific literature.  She testified regarding the syndrome as it was manifested in the behavior of D.C. during the time of the alleged molestation attributed to defendant.

Detective Harrison met with defendant at his workplace and brought him to the Daly City police station on June 1, 2012.  Also present was Detective Cecilia Garay, a certified Spanish interpreter.  The officers videotaped this meeting with defendant and it was played to the jury at trial.  A transcript of the interview was also provided to the jury.  In the interview, defendant indicated he was 44 years old and worked as a dish washer in San Francisco.  He stated he had no reason to believe he had done anything wrong.

Defendant admitted he had been living for a period with his cousins and their daughter, D.C.  Defendant stated initially he had never touched the girl.  The officers indicated they believed defendant was not interested in hurting D.C., only to be nurturing and loving.  He responded that he was not familiar with "that case."  He maintained he did not play games in the dark with D.C. or her brother, and that he did not even touch her by mistake.

As the interview continued and defendant continued to deny any improper conduct, Harrison then indicated he had obtained the DNA of a male from the person of D.C. and he was going to match the evidence with a sample from defendant.  They told him that DNA told the truth.

At this juncture, defendant stated that when he moved into the home in Daly City, D.C. would jump on him and play with him while he visited with his cousins.  He believed this was a normal thing for a child.  Later, D.C. would try to sleep on top of defendant.  He was taking care of her, usually after he had worked his shift and her parents were at their jobs.  He was tired at the time and the girl would just get on top of him.  "That was it."  D.C. just would be "clinging to people."  Again, defendant stated he always respected the girl.

4

Detective Harrison then discussed the phone call from Mrs. C. where she indicated D.C. accused defendant of touching her. Defendant stated that Mrs. C. was confused. He told the mother he had no relations with D.C.

The officer told defendant that since he was not telling him the truth, he was going to take a swab of saliva to compare it with evidence the police had. Defendant stated any testing would not indicate he had relations with the girl. Harrison then said he would take the saliva and compare it with what was found on the body of D.C.; the police wanted him to tell the truth.

With this comment, defendant told the police he had no bad intentions towards the girl. She would jump on him and "throw herself on me." He affirmed she would kiss him on the mouth, but defendant would tell her not to do this because they were family. Defendant told D.C. that his cousins would find out about this conduct and he would be in trouble. Defendant acknowledged that D.C. was nine years old during this period.

Defendant admitted that while he was in bed, the minor would come into his room and jump on top of him. She would kiss him and he felt she was "promiscuous." She would become angry when he refused to massage her breasts, but he did put his mouth on D.C.'s breasts at times.

The game that defendant played in the dark with D.C. and C.C. was devised by the minor girl. It enabled her to have him touch her private area without C.C. knowing because he was busy trying to find the hidden money. The interview with the police continued with defendant indicating the minor was the provocative one who would demand he embrace or touch her on a regular basis. Even when he was tired from work, she would persist in demanding his physical attention to her. In the end, defendant did only what he was asked to do by the girl; since he was compliant, there was nothing he did wrong.

In his trial, defendant testified in his defense. He indicated he was born in Honduras and had only a sixth-grade education. He came to the United States at the age

5

of 38, leaving behind his wife and five children.  He testified he never played any games with D.C. and did not have physical contact with her.  He never showed her a video with a couple engaging in sexual intercourse.  He did not touch her in any way.

Regarding his statements to the police presented in the video exhibit, defendant testified he did not comprehend what they were discussing with him.  Being asked questions by police made him nervous.  When he was nervous, he tended to make false statements.  He acknowledged he made these false comments because he was nervous during the interview.  He did not do anything wrong to the child.

## ANALYSIS

The trial court conducted a hearing based on defendant's motion to suppress his statements to Detective Harrison with Detective Garay as the Spanish interpreter.  The hearing focused on the review of the taped interview and arguments of counsel.  After that review, the trial court concluded on the issue of *Miranda* that there was an interrogation of defendant, but that he was not in custody at the time of the interrogation even though he had travelled with police from work to the Daly City police station.  "The issue with regard to *Miranda* is whether there was interrogation and whether the person was in custody.  There clearly was interrogation. [¶] Whether or not the person was in custody.  And the test is a preponderance one under the federal standard.  And the issue is what would a reasonable person have taken from the circumstances. . . . [¶] . . . [¶]  He was told he was free to go.  He was never disabused of that idea that he was free to go.  Under those circumstances, and based on the reasonable circumstances, and not based on the defendant's upbringing and not based on how he unequally interpreted words or activity but rather what a reasonable person would do under those circumstances.  And under that standard, it is clear to me that the defendant was not under arrest and was not under the functional equivalent of arrest and thus . . . the statement of the defendant is admissible."

6

As an appellate court, we have a standard of review for *Miranda* custody issues. The review is one of fact, subject to our assessment of substantial evidence. (*People v. Clair* (1992) 2 Cal.4th 629, 678.) "In reviewing a trial court's *Miranda* ruling, we accept [the trial court's] resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.) We then "independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (*Ibid.*) While we make an independent determination from our review of the record below, we also give " 'great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence. [Citation.]" (*People v. Jennings* (1988) 46 Cal.3d 963, 979.)

On the separate issue of voluntariness raised by defendant, it is the burden of the prosecution to establish " 'by a preponderance of the evidence, that a defendant's confession was voluntary. . . . [¶] Under both state and federal law, courts apply a "totality of the circumstances" test to determine the voluntariness of a confession. . . . On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citation.]' " (*People v. Holloway* (2004) 33 Cal.4th 96, 114.)

*Miranda* warnings are required if the individual is undergoing "custodial interrogation." (*Miranda, supra* , 384 U.S 436, 444.) "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125.) The fact defendant was taken from work to a police station does not amount to evidence of custody. In *People v. Moore* (2011) 51 Cal.4th 386, a murder suspect was not in custody even though he interviewed at the sheriff's office. (*Id.* at pp. 397-398.) He freely went with the officers to the station and was told he was free to leave and would

eventually be driven home. (*Ibid.*) In *People v. Chutan* (1999) 72 Cal.App.4th 1276, the defendant was invited to the police station, expressly told he was not under arrest, and driven away after he gave a statement. (*Id.* at pp. 1282-1283.)

The test of custody is based on "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) We examine how a reasonable person in the suspect's position would have understood his situation to be. Even if the police officers themselves suspect the defendant has committed a crime, this notion does not make the questioning custodial. (*People v. Carpenter* (1997) 15 Cal.4th 312, 384, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)

Here, the trial court found an interrogation took place. That prong of *Miranda* was satisfied. However, the court found that defendant was not in custody, and ample evidence supports the determination. We concede the fact defendant was questioned at length at the police station. However, the officers advised him he was not under arrest; he could stop talking at any time and they would take him back to work. There were no restraints or cuffs used here. Detective Garay was assisting in Spanish during the meeting.

It is also obvious defendant felt comfortable stating and restating his version that D.C. was a promiscuous young girl who planned enticing him. While the officers kept bringing defendant back to the alleged improper touching of the victim, he presented his claim the girl was a young handful who sought his attention regularly.

It is true Detective Harrison misled defendant on the existence of DNA evidence from the victim before defendant advanced his claim D.C. was the aggressor in the relationship. By itself, however, deception is compatible with lawful police interrogation. "So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are

8

admissible in evidence." (*People v. Chutan, supra,* 72 Cal.App.4th at p. 1280, emphasis in original.) In *Frazier v. Cupp* (1969) 394 U.S. 731, the police falsely advised the defendant his accomplice had confessed and was captured. (*Id.* at p. 737.) As was observed by our Supreme Court, "Nor did the detective's deceptive statements offend any constitutional guaranty. The detective implied at various times that he knew more than he did or could prove more than he could. Such deception regarding the evidence was permissible, for it was not ' "of a type reasonably likely to procure an untrue statement." ' [Citation.] In sum, the prosecution met its burden of proof to show the statements were voluntary." (*People v. Jones* (1998) 17 Cal.4th 279, 299.) Our Supreme Court has concluded a false statement that fingerprints found on a wallet incriminated the suspect were not the type of deception that would procure an involuntary confession. (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) Naturally, if deception regarding fingerprint evidence is tolerable, the purported existence of DNA evidence is of similar import.

A review of the video interview in this case leads us to conclude defendant's statements were not involuntary. To be obtained in violation of the Fifth Amendment, the statements must be extracted by threats or violence, obtained by direct or indirect promises, or secured by improper influence. (*People v. Maury* (2003) 30 Cal.4th 342, 404.) A confession is not voluntary when it is coerced by physical intimidation or psychological pressure. (*Townsend v. Sain* (1963) 372 U.S. 293, 307, overruled on another ground in *Keeney v. Tamayo-Reyes* (1992) 504 U.S. 1, 5.) Again, as noted above, this is an assessment based on the totality of the circumstances.

Here, the trial court implicitly concluded the statements of defendant to Detective Harrison were voluntary. It made the conclusion after reviewing the video and listening to counsel's arguments. We reviewed the same exhibit. At two instances, defendant laughed with the officers. Defendant seemed calm and alert during the questioning. He felt comfortable enough to argue the alleged victim's sexual instincts were the cause of his predicament. Additionally, at no time did the police indicate to defendant the matter

9

would go away if he gave them what they wanted. Also, the authorities hold that police misstatements on the strength of their case does not provide a necessary finding of involuntariness. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240-1241.)

In his brief, defendant references *People v. Esqueda* (1993) 17 Cal.App.4th 1450 (*Esqueda*) to support his claim the statements were involuntary. However, that case is easily distinguished from our case. In *Esqueda,* the police falsely advised the defendant they had a dying declaration from the victim, found his fingerprints at the crime scene, and had at least one additional eyewitness to the crime. (*Id.* at p. 1485.) The accused was interrogated in that case for a period in excess of eight hours with little interruption. (*Ibid*.) The subject was told by the police the specific facts he had to acknowledge to stop the interrogation. (*Id.* at pp. 1485-1486.) Finally, he was frankly told that if he did not talk, it would result in more serious charges. (*Id.* at pp. 1485-1486.) Our facts are not remotely akin to the improper conduct in that case. (*Id.* at p. 1486.) Under the totality of the circumstances, we must concur with the ruling of the trial court on the admissibility of the statements by defendant. The denial of the motion to preclude defendant's statements during the trial is affirmed.

## DISPOSITION

Based on our review of the issues in this case, we affirm the judgment.


_____
Dondero, J.

We concur:

_____
Margulies, Acting P.J.


_____
Banke, J.

10