Filed 1/2/26  P. v. Rangel CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B336586 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA157726) |
| v. | |
| ANDREW RANGEL et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed.

Alex Green, under appointment by the Court of Appeal, for defendant and appellant Andrew Rangel.

Jennifer A. Mannix, under appointment by the Court of Appeal, for defendant and appellant Alfonso Garcia.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

# INTRODUCTION

The People charged Andrew Rangel and Alfonso Garcia with murdering Freddie Rosas and with being felons in possession of a firearm. The People also alleged firearm use sentencing enhancements against Garcia. A jury found both defendants guilty of second degree murder and possession of a firearm by a felon, and found true the firearm use enhancement allegations. The trial court imposed prison terms on Rangel of 18 years to life, and on Garcia of 62 years and four months to life, including a 25-year term on one of the firearm use enhancements.

Both Rangel and Garcia contend we must reverse their convictions because the trial court erred in overruling a defense objection to a peremptory challenge by the prosecutor. Garcia contends the court prejudicially erred when it denied his motion to exclude evidence of incriminating statements he made to an undercover police officer posing as a cellmate. Rangel argues that, if we conclude Garcia's challenge to the motion to exclude ruling has merit, Rangel's counsel rendered ineffective assistance by failing to join in that motion. Rangel separately contends that his trial counsel was ineffective for failing to seek redaction of the portion of Garcia's statements to the undercover officer which inculpated Rangel. Lastly, Garcia contends the trial court erred by failing to strike the firearm use enhancement when imposing sentence on him.

We find no merit to any of these challenges and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Neither Rangel nor Garcia challenges the sufficiency of the evidence against them. We summarize the facts and procedural history only to the extent they are relevant to the claims on

2

appeal. We provide additional detail regarding the voir dire and Garcia's motion to exclude statements he made to an undercover officer below in our analysis of those issues.

## A.    The Charges Against Rangel and Garcia

In an information filed on February 16, 2023, the People charged Rangel and Garcia with the May 24, 2019 murder of Rosas (Pen. Code,[1] § 187, subd. (a); count 1) and alleged that in committing the murder Garcia personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally discharged a firearm causing great bodily injury or death to a person other than an accomplice (*id.*, subd. (d)). The People also charged both Rangel and Garcia with possession of a firearm by a felon at the time of the murder (§ 29800, subd. (a)(1); counts 2 [Rangel] and 3 [Garcia]), and additionally charged Garcia with possession of a firearm by a felon on February 10, 2022 (*ibid.*; count 5).[2]

## B.    Rangel Objects to the Prosecutor's Peremptory Challenge of a Prospective Juror

During voir dire, the prosecutor made a peremptory challenge to prospective juror (PJ) 22 on the ground that PJ 22's pause in answering a hypothetical question about aiding and abetting liability showed she was uncomfortable with the concept of accomplice liability. The prosecutor explained that accomplice liability was relevant because the evidence would show that

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

[2] The information did not include a count 4.

3

Garcia was the actual shooter and Rangel had driven Garcia to the murder scene. The prosecutor stated at sidebar that PJ 22 "appears to be a female either Asian or some kind of descent like that." Both defense counsel objected, contending that PJ 22's hesitation in responding was more likely due to her need for time to process the question, which counsel argued did not supply sufficient detail. Garcia's counsel posited that PJ 22 was Caucasian; Rangel's counsel opined "[s]he is Latina," but agreed when Garcia's counsel added, "[v]ery light skinned."

The court overruled the objection, finding the prosecutor's question was not objectionable and the prosecutor could properly assess prospective jurors based on their "reactions" to the hypothetical. The People then exercised a peremptory challenge to PJ 22, and the court excused her.

## C. Garcia's Motion to Exclude His Jail Cell Statements to an Undercover Police Officer

On February 10, 2022, Garcia was arrested and placed in a cell with an undercover police officer who was posing as an inmate. The two spoke and their conversation was surreptitiously recorded. This type of ruse is referred to as a "*Perkins*[3] operation" and we refer to the undercover officer as a "*Perkins* agent."

Garcia divulged to the *Perkins* agent that he was a gang member and, while driving around with Rangel and Rangel's girlfriend, he saw someone whom he thought was a rival gang member and shot that person with a nine-millimeter gun. Garcia

---

[3] *Illinois v. Perkins* (1990) 496 U.S. 292, 297-298 [110 S.Ct. 2394, 110 L.Ed.2d 243] (*Perkins*).

4

identified the victim as "Toro," which was Rosas's gang name. Garcia also stated that Rangel, a fellow gang member, had handed the gun to Garcia.

Garcia moved to exclude admission of his statements to the *Perkins* agent on the ground that he made the statements under coercive circumstances. The court denied the motion, finding no coercion and that Garcia believed he was speaking with another inmate, not the police. During argument on the motion, Rangel's counsel advised the court that he had "an objection to just an aspect of [the conversation between Garcia and the undercover officer]" that he intended to raise at a later time. Rangel's counsel later withdrew the objection.

**D.    Trial**

The evidence presented at trial included the following.

1.    *Aubrey Herrera's Testimony*

Aubrey Herrera testified under a grant of immunity. At the time of the shooting, she was dating Rangel and was pregnant with his child. Herrera knew that Rangel and Garcia were members of the Pico Nuevo gang. Rangel's gang nickname was "Whisper" and Garcia's was "Assassin."

On May 24, 2019, Herrera, Rangel, and Garcia were driving around in a white Toyota Prius that Rangel had stolen from his mother. They "drove around to go hit up" or "bang[] on people," which Herrera explained meant finding members of rival gangs by asking people what gang they belonged to. Rangel drove, Herrera sat in the front passenger seat, and Garcia sat in the back behind Rangel. According to Herrera, only Garcia was "banging." Herrera saw Garcia with a gun but did not know whose gun it was. She did not see Rangel hand Garcia the gun and did not see Rangel hold the gun at any point.

5

In the area of Mills Avenue and Mulberry Drive in Whittier, Garcia got out of the car and "banged on somebody." Seconds later Herrera heard gunshots. Garcia ran back to the car and, once inside, stated that whoever he hit up "knew his homies, but he didn't care." Garcia and Rangel told Herrera not to say anything and then they drove off. Later on, Rangel told Herrera that he "wouldn't have shot if it was him doing that." Herrera and Garcia never spoke about the shooting. Herrera admitted to being high on drugs on the night of the murder and being addicted to methamphetamine at the time of the shooting.

Herrera later found out that it was Rosas who had been shot. Years before the shooting Herrera had dated or hooked up with Rosas. Rosas was in the 41st Street gang and his gang nickname was "Toro."

During a tape-recorded phone conversation Herrera had with Rangel in June 2019 while he was in jail, Rangel told her that somebody who knew Rosas had asked him what had happened during the shooting and Rangel said it was "a hit."

Later, people from Pico Nuevo told Herrera not to testify, which she interpreted to be threats. When Los Angeles County Sheriff's Department (LASD) Detective Matthew Landreth interviewed Herrera in December of 2020, she was scared and lied, saying she did not know anything about Rosas's murder. When Detective Landreth interviewed Herrera again in about February 2022, she told him that people from Pico Nuevo had been threatening her, that she was concerned they would hurt her mother, and that she had lied during the December 2020 interview. Herrera told the detective that Rangel and Garcia went banging on people the night of the murder. She also told the detective that Rangel was driving, Garcia was holding the

6

gun, and that she did not see Rangel hand Garcia the gun. Herrera testified that she did not recall telling the detective that Rangel had the gun. Herrera was still using drugs at the time she spoke with the detective the second time.

2. *Detective Landreth Testifies About Herrera's Statements*

Detective Landreth testified about his two interviews of Herrera. During the first interview, in December 2020, Herrera denied any personal knowledge of Rosas's murder. During the second interview, in February 2022, Herrera was reluctant to talk because she feared reprisals from the Pico Nuevo gang and Rangel knew where her mother lived. Herrera never stated during the interview that Rangel said, "I wouldn't have done that," as she testified earlier in the day. The detective testified, "[Herrera] was clear on both of them, . . . that both Mr. Rangel and Mr. Garcia were out there gang-banging and hitting people up in different neighborhoods." Also, according to the detective, Herrera stated during the February 2022 interview that the gun belonged to Rangel.

3. *The Surveillance Videos*

Detective Landreth authenticated surveillance videos from a convenience store and apartment complex near the murder scene. The videos depict Rosas speaking with two other people in front of the convenience store; he was carrying a canned beverage which was later found in the area of the shooting. Rosas began walking on Mills Avenue and a white Prius with black rims drove next to him; at one point Rosas looked over his shoulder at the Prius. Rosas turned onto Mulberry Drive and the Prius did as well and drove past Rosas. The Prius turned into the parking lot of the apartment complex, entering the wrong way on a one-way

access road.  The Prius then made a U-turn and stopped at a stop sign at Mulberry Drive.  It waited at the stop sign for about four to five seconds even though there was no cross-traffic.  The Prius then turned left (westbound) onto Mulberry Drive.  Soon after, Rosas appears again, walking on Mulberry Drive also westbound but behind the Prius, which had driven out of the camera's view.  Then a person with only their legs visible ran eastbound on Mulberry Drive in Rosas's direction and, a few seconds later, ran back westbound.  Video from a different camera shows that Rosas then ran east on the sidewalk of Mulberry Drive in the area where a trail of blood was later discovered.

After viewing the surveillance videos, investigators found that a white Prius with black rims was registered to Rangel's parents.

### 4.    *The Recorded Phone Conversations*

The prosecution played for the jury part of a recording of a June 27, 2019 phone conversation between Herrera and Rangel, who at the time was in jail.  On the recording, Rangel told Herrera that he ran into one of Rosas's "homeboy[s]" from the 41st Street gang and "gave him the whole rundown," including saying to him, " 'Look, fool.  Like, it was a hit.  You know?' " Herrera asked Rangel why he had told this to Toro's gangmate and he responded, " 'Cause I want the beef."  Herrera then said, "You're a fucking idiot," and later, "Just stop talking about it" and "Shut up, Andrew.  They record the calls.  Shut up."

The prosecution also played for the jury part of a recording of a July 26, 2019 phone conversation between Garcia and Rangel while the latter was in jail.  Rangel stated that he told someone named "Boxer" that "if he sees [Herrera], fool, tell her to fuck—she's playing with fire, my boy," and Garcia responded, "Hey for

8

reals, right? . . . [¶] . . . [¶] . . . she's [*sic*] knows too much." Rangel later stated, "That's why I'm scared to let her go, fool. Like, she's like a liability.  I told the homies she's a liability, my boy."  Rangel also stated that he told Herrera she was a "liability."  Garcia stated, referring to Herrera, "she's sure as fuck not ratting on me."

     5.     *The* Perkins *Operation*

The prosecution played for the jury a recording of Garcia's February 10, 2022 conversation with the *Perkins* agent.

At the beginning of the recording, the *Perkins* agent asked Garcia, "What's up, homie?  What's your name?" and Garcia responded, "Assassin."  The *Perkins* agent asked if Garcia was "from Pico" and Garcia replied, "Yeah."  The *Perkins* agent told Garcia he knew some of his gangmates, using their gang names. Garcia said he had been arrested for some type of probation violation but had not been informed of any details.  The *Perkins* agent claimed to have an extensive criminal history and to have just finished a lengthy prison term.

When Garcia asked the *Perkins* agent if he had seen "Whisper," the agent responded, "Yeah," and said that Whisper had been taken into custody along with "some girl."  The *Perkins* agent said he "hate[d] to say something" but "[Whisper] was telling [him] a story" and "giving [him] the rundown."  Moments later, Detective Landreth entered the cell and stated he had a search warrant for a DNA swab from Garcia based on a co-conspirator's statement; it involved "the murder of Toro in 2019 in Whittier," and the police had "video evidence" and "physical evidence recovered from a white Toyota Prius that [*sic*] used during the commission of the murder."

After the detective left the cell, the *Perkins* agent said to Garcia, "Oh man. You need to know what to do and what not to do, bro. I've been through this three times." The *Perkins* agent told Garcia that "[Whisper] was saying something about his mom's car. That fool, your homeboy. Maybe I'm wrong, it's just coincidence," to which Garcia replied, "No, it's making sense, everything" and "that fool Whisper was talking about me with you." Garcia and the *Perkins* agent discussed what type of sentence Garcia might receive, and the *Perkins* agent asked, "was it gang related? [The victim] wasn't a gang member" to which Garcia replied, "He's a gang member. Yeah, yeah but we don't beef with them." The *Perkins* agent later said to Garcia, "[e]xplain what you did," telling him he would divulge what Whisper had said "but [he] want[ed] to hear what [Garcia] got to say first," and he would "tell [Garcia] what to say and what not to say."

Garcia then said he was driving around with Whisper and Whisper's girlfriend when he saw an individual he thought was from the Southside Whittier gang who might be "slipping";[4] Whisper's girlfriend said it was "Toro" but Garcia had "already jumped out of the car . . . with [the] gun in [his] hand." Garcia said that when he got out of the car he was "ready to go" and "had it out already"; Rosas claimed to know "[Garcia's] homies," but Garcia "lit him up." Garcia stated the gun he used was a "9" and he shot three times. The *Perkins* agent asked who had the gun and Garcia replied that Whisper had it and put it in Garcia's

---

[4] In gang terminology, "slipping" means a gang member is outside of their territory without a gun, or in their territory but not paying attention.

hand. The *Perkins* agent said Whisper had "told [him Garcia] got it from the console," to which Garcia responded that Whisper was "lying."

6. *The Police Investigation*

LASD deputy Robert Guzman testified that on May 24, 2019, he responded to Mulberry Drive to investigate a reported shooting. At the scene, he found a male who had been shot in the lower torso; the victim was alive but was unable to speak. Deputy Guzman was later notified that the victim had died at the hospital. Deputy Guzman found three expended shell casings and noticed a blood trail from where the shell casings were found to where he found the victim.

LASD detective Dean Camarillo explained that a semiautomatic firearm expels shell casings after a bullet is fired. The shell casings found at the murder scene were from a nine-millimeter gun. Detective Landreth later testified that forensic examination determined the three shell casings could have been fired from the same firearm.

7. *Gang Expert Testimony*

LASD sergeant Stephen Valenzuela testified as a gang expert, explaining several aspects of gang culture. Gang members can enhance their status within their gang by committing crimes on behalf of the gang or "banging," which involves announcing their gang membership and challenging others to identify if they belong to a gang; this conduct helps to project a gang's strength to rival gangs and the community. Banging can lead to violence, but violence does not occur every time a gang member bangs on a member of a different gang. If a gang member brags about a crime he did not commit, he could face repercussions from the gang, including being assaulted or

11

killed.  A "beef" means dislike, disrespect, or a problem between gangs.

Sergeant Valenzuela knows Rangel and Garcia; they are members of Pico Nuevo and go by the monikers of "Whisper" and "Assassin," respectively.

8.    *Evidence Supporting the Charges for Possession of a Firearm by a Felon*

In addition to the evidence that a gun was used in Rosas's murder, LASD deputy Dave Perez testified that during a search of Garcia's home on February 10, 2022, he found a loaded semiautomatic pistol in a duffle bag.  The parties stipulated that this gun was not the one used to shoot Rosas.

The parties stipulated that Rangel and Garcia had each suffered a felony conviction within the meaning of section 29800, subdivision (a)(1) before Rosas's murder.

9.    *Defense Evidence*

Garcia and Rangel elected not to testify and did not present any evidence in their defense.

## E.    The Jury's Verdict

Before the case was submitted to the jury the court dismissed the section 12022.5, subdivision (a) firearm enhancement allegation against Garcia.

On May 12, 2023, the jury convicted Rangel and Garcia on all counts, finding the murder to be in the second degree and the firearm enhancements alleged against Garcia under section 12022.53, subdivisions (b) through (d) to be true.

## F.    Trial on the Bifurcated Issues and Sentencing

Pursuant to stipulation, the court alone tried the sentencing-related allegations.  On January 19, 2024, the court

found true allegations that Garcia had suffered a prior strike under the Three Strikes law.  (§ 1170.12.)  The court also found true allegations that Rangel and Garcia had both engaged in violent conduct in committing the offenses indicating a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)) and had served a prior term in prison or jail (*id.*, rule 4.421(b)(3)).

At sentencing, Garcia's counsel noted that in an unrelated case from earlier in the day the court had sentenced the defendants to 24 years, and asserted that Garcia's case "[did not] seem much more egregious" and the cases involved "basically the same circumstances."  Counsel then "ask[ed] the court to think about the sentence that was imposed this morning on the other two and consider that maybe we should be closer to that range."  The court responded that the other case involved "an agreed upon disposition" and "was a different situation and the court approaches each of these cases in their unique individuality."

The court sentenced Rangel to 18 years to life imprisonment, composed of consecutive terms of 15 years to life for second degree murder and the upper term of three years for possession of a firearm by a felon.  The court sentenced Garcia to 62 years and four months to life in state prison, composed of the following consecutive terms: 15 years to life for second degree murder, doubled to 30 years to life pursuant to section 1170.12, subdivision (c)(1); 25 years to life for the firearm enhancement under section 12022.53, subdivision (d); the upper term of three years for possession of a firearm by a felon (count 3), doubled to six years under section 1170.12, subdivision (c)(1); and the middle term of eight months for possession of a firearm by a felon (count 5), doubled to 16 months under section 1170.12, subdivision (c)(1).

13

Rangel and Garcia both timely appealed.

## DISCUSSION

### A. The Trial Court Did Not Err in Overruling Defendants' Objection to the Peremptory Challenge to PJ 22

Rangel contends that the trial court erred under Code of Civil Procedure section 231.7 in overruling his objection to the prosecutor's peremptory challenge to PJ 22 because the People offered a presumptively invalid reason for challenging that juror and because an objectively reasonable person would view race or ethnicity as a factor in that challenge. Garcia joins Rangel's argument.

#### 1. *Legal Principles and Standard of Review*

Code of Civil Procedure section 231.7 prohibits parties from "us[ing] a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (*Id.*, subd. (a).) The statute "creates new procedures for identifying unlawful discrimination in the use of peremptory challenges. [¶] . . . [T]he party objecting to the peremptory challenge is no longer required to make a prima facie showing of racial discrimination. Instead, 'upon objection to the exercise of a peremptory challenge . . . ,' the party exercising the peremptory challenge must state the reasons for exercising the challenge. ([*Id.*], subd. (c).)" (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943.) "The court shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances. The court shall consider only the reasons

14

actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge.  If the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained.  The court need not find purposeful discrimination to sustain the objection. . . ."  (Code Civ. Proc., § 231.7, subd. (d)(1).)

As relevant here, the statute identifies three specific reasons for a peremptory challenge which "have historically been associated with improper discrimination in jury selection" and provides that they "are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party.  Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried."  (Code Civ. Proc., § 231.7, subd. (g)(1), (2).)  These three presumptively invalid reasons are:  "(A) The prospective juror was inattentive, or staring or failing to make eye contact.  [¶]  (B) The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor.  [¶]  (C) The prospective juror provided unintelligent or confused answers."  (*Id.*, subd. (g)(1).)[5]

_____

[5] The statute separately provides that certain other justifications for a peremptory challenge are "presumed to be invalid" and that this presumption can only be overcome "by clear

15

We review the denial of a Code of Civil Procedure section 231.7 objection de novo, and the trial court's express factual findings for substantial evidence. (*Id.*, subd. (j).) Under the statute, we must "not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record." (*Ibid.*) In addition, we must consider only reasons actually given to explain the party's use of the peremptory challenge and may "not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror." (*Ibid.*) If we conclude the trial court erred by overruling an objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

2.    *Defendants' Objections to the Prosecutor's Peremptory Challenge to PJ 22 and the Trial Court's Ruling*

During voir dire the prosecutor repeatedly questioned the venire about the concept of holding a person liable for aiding and abetting another person's crime, using a hypothetical involving the getaway driver in a bank robbery. Initially, in questioning

---

and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (Code Civ. Proc., § 231.7, subd. (e).) Defendants do not contend that the prosecutor justified her challenge to PJ 22 for any reason rendered presumptively invalid by subdivision (e).

16

the first 18 prospective jurors, the prosecutor stated, "Now, what the law says is, if the driver who got the guy there, who waited for him, the get-away driver—if he shows the same mental intent to commit that crime, that robbery, and he does something to aid in that robbery—drove him there. Drove him away. He's the get-away driver—the law allows for both to be held accountable for that robbery. Okay?" The prosecutor then asked the first set of prospective jurors whether they thought this concept was "fair."

After some prospective jurors were excused, PJ 22 was added to the group of prospective jurors being questioned. PJ 22 said that she lived in Pico Rivera with her family and worked as a teacher.

The prosecutor referred to her previous bank robbery hypothetical, stating, "there are many crimes that are like team sports. Really what I was getting at is the fairness." The prosecutor then presented several prospective jurors, including PJ 22, with the question, "If I prove to you beyond a reasonable doubt, they [both] have the same mental intent. They [*sic*] in fact the driver aided and abetted, do you think it's fair we can hold drivers accountable for the same crime as the actual person that goes into the bank?" PJ 22 responded, "I was thinking if the driver is not robbing the bank?" The prosecutor responded, "The actual hypothetical given to you is it's whatever crime the actual direct perpetrator commits. The aider and abettor has to share the same mental intent and they have to do something to aid that. Does that make sense?" PJ 22 then responded, "Yes." The prosecutor followed up, "The question is do you think it's fair? Because there [are] some people that's like no. I think only the person that has the gun and goes in the bank. And there [are] others that say, wait a minute. A lot of crimes you can't commit

17

alone. . . .  You need a driver.  The person that goes in with the gun.  In some cases you have a look out. . . .  But I have some jurors and it's a fair concept that says, no.  Only the guy with the gun.  That's what I am trying to find out.  What do you think [PJ] 22[?]"  PJ 22 responded, "Yes."

Later, in chambers, the prosecutor indicated she intended to exercise a peremptory challenge to PJ 8, a Black male, based on his responses to questions about the aiding and abetting hypothetical.  Garcia's counsel objected, arguing that PJ 8's response to the hypothetical was "completely appropriate" and he did not express that the concept of aiding and abetting liability was unfair.  The prosecutor responded, "I am arguing that my entire case for defendant Rangel is on aiding and abetting theory which is why it's so important and defense has not argued one thing that this is not a race neutral."  The prosecutor pointed out that she had exercised a peremptory challenge to PJ 1, a White male, because of his concerns about aiding and abetting liability, and also intended to exercise a peremptory challenge to PJ 22, whom she stated "appears to be a female either Asian or some kind of descent like that."

The court found that the prosecutor exercised the peremptory challenge to PJ 8 for a proper reason, a ruling neither defendant challenges on appeal.  The court then asked whether defense counsel wanted to be heard about the peremptory challenge to PJ 22 and Garcia's counsel stated, "I think if you are asking about aiding and abetting, then give them the full law.  And not just frame it in such [a way] where you can say, well I don't think they will follow me because of what they paused or something."  Rangel's counsel contended that some jurors needed time to process questions and their hesitation in responding did

18

not mean they had a concern about aiding and abetting liability, and that the jurors should be given "the full facts [and] the case law." The court asked defense counsel if they "want[ed] to put on the record some kind of agreement of what they are guessing [PJ 22] is"; Garcia's counsel responded, "I would venture Caucasian" and Rangel's counsel responded, "[s]he is Latina"; Garcia's counsel then stated, "[v]ery light skinned," and Rangel's counsel agreed.

After Garcia's counsel reiterated his objection to how the prosecutor phrased her question, the court stated, "Doesn't that happen sometimes when the People give the cookie analogy or the rain analogy.[6] And it's not that we are giving them the full law yet on circumstantial evidence. We are just giving them a hypothetical and then we see their reaction and then we make decisions as lawyers based on their reactions to those kind of [questions]. That's the way I see it. . . . The objection as to [PJ 22] is overruled at this time."

> 3. *Defendants Forfeited Their Claim that the Prosecutor's Proffered Reason was Presumptively Invalid*

The prosecutor justified her peremptory challenge to PJ 22 on the same ground she had challenged PJ 1 and PJ 8, namely, these prospective jurors "had a problem with" the concept of "shared intent," which was critical to the case against Rangel.

---

**6** The court had earlier presented the prospective jurors with an analogy involving an empty cookie jar to address the concept of a defendant's right to remain silent, and the prosecutor had presented an analogy involving rain to address the concept of circumstantial evidence.

Rangel contends that the prosecutor struck PJ 22 "based on her demeanor, to wit: her hesitancy, and/or her confusion, in answering the prosecutor's question regarding shared intent." Thus, goes Rangel's argument, the prosecutor's challenge to PJ 22 was presumptively invalid under Code of Civil Procedure section 231.7, subdivision (g)'s demeanor-related provisions, and the trial court erred by failing to engage in the analysis required by that provision.

Defendants forfeited this claim by failing to raise it in the trial court. Neither defense counsel claimed to the trial court that the prosecutor's proffered reason for challenging PJ 22 was presumptively invalid nor that it was tantamount to a challenge based on "demeanor" or a "confused answer." We disagree with Rangel's suggestion that his trial counsel raised the issue of presumptive invalidity by referring generally to jurors "paus[ing]" or "hesitat[ing]" because of how the prosecutor framed her question about shared intent. All counsel agreed PJ 22 had paused/hesitated in answering the prosecutor's question, used those phrases to express that agreement, and debated whether that pause/hesitation supported the prosecutor's justification that PJ 22 had reservations about the fairness of aiding and abetting liability. The use of these phrases did not suggest defense counsel were claiming the prosecutor was challenging PJ 22 based on "problematic . . . demeanor" or a "confused answer[]" under Code of Civil Procedure section 231.7, subdivision (g), nor did either counsel contend the prosecutor's proffered reason was presumptively invalid or subject to scrutiny under that subdivision. (See *People v. Gonzalez* (2024) 104 Cal.App.5th 1, 18 [concluding the prosecutor's peremptory challenge did not need to be analyzed under Code Civ. Proc., § 231.7, subd. (g) where the

20

prosecutor's "comments on [the prospective juror]'s demeanor did not constitute an independent justification for his peremptory challenge but were intended to support his challenge on the ground that [the prospective juror] expressed doubt about remaining impartial"].) As a result, the trial court had no reason to subject the prosecutor's proffered reason to heightened scrutiny under Code of Civil Procedure section 231.7, subdivision (g).

" ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590; see *People v. Mills* (2010) 48 Cal.4th 158, 170 ["A party must make a timely and specific objection to the manner in which a trial court conducts jury selection or the matter is forfeited for appeal"].) "The rule is designed to advance efficiency and deter gamesmanship. . . . ' " ' "The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' " ' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

> 4.  *Even if the Objection Was Not Forfeited, Express Findings Rebut Any Presumptively Invalid Basis For the Challenge*

Even if we overlooked Rangel's forfeiture, and assume both that a proper objection was raised and that the peremptory challenge at issue fell within Code of Civil Procedure section 231.7, subdivision (g), the record contains express findings

21

sufficient to overcome the presumption of invalidity. The prosecutor did not make a generalized challenge to PJ 22 based on any grounds prohibited by section 231.7, such as PJ 22's overall attention, demeanor, or body language. Instead, the prosecutor raised a specific concern about how PJ 22 answered a particular question about the fairness of aiding and abetting liability, which was the theory of prosecution as against Rangel.

There was no dispute that PJ 22 hesitated when answering the prosecutor's questions about the fairness of aiding and abetting liability; the court and counsel all observed it. (Code Civ. Proc., § 231.7, subd. (g)(2) [trial court must confirm asserted behavior occurred, including based on the observations of counsel for the objecting party].) The only question presented to the trial court for resolution was *why* that hesitation occurred. Rangel's trial counsel claimed the hesitation was because the prosecutor's question was confusing and it took "time for [jurors] to process" such questions, and that the pause indicated nothing about PJ 22's views on aiding and abetting liability. The prosecutor believed PJ 22's hesitation showed PJ 22 had concerns with the fairness of aiding and abetting liability, and the prosecutor identified other jurors (including a White male and Black male) she had challenged based on the same concern. Thus, the counsel offering the reason for the peremptory challenge explained, as required, "why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matter[ed] to the case to be tried" as statutorily required. (*Ibid*.) After hearing from both sides, the court rejected the defense contention that the question was confusing or that the pause indicated only that the juror was processing the question, accepted as credible the

22

prosecutor's explanation as to why she had exercised the challenge, and overruled the defense objection.

   5.   *The Trial Court Did Not Otherwise Err in Overruling Defendants' Objection to the Peremptory Challenge to PJ 22*

Rangel alternatively contends that an objectively reasonable person would perceive that PJ 22 was challenged because she is Hispanic.  We disagree.  Rangel's defense counsel argued that the prosecutor's peremptory challenge to PJ 22 could be objectively perceived as being based on race or ethnicity because the prosecutor's proffered reason was not supported by the record.  (Code Civ. Proc., § 231.7, subd. (d)(3)(F) [in evaluating a challenge to a peremptory challenge the court can consider "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record"].)  The trial court found to the contrary, and substantial evidence supports its finding.

The prosecutor was reasonably concerned about prospective jurors who appeared hesitant to impose liability for aiding and abetting.  The prosecutor consistently questioned prospective jurors, including PJ 22, on this topic through the hypothetical of a bank robbery involving an actual perpetrator and a driver, asking the prospective jurors if it was "fair" to hold the driver liable if they had the same intent as the actual perpetrator.  (See *id.*, subd. (d)(3)(C)(i),(ii) [court can consider "whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge" and "[w]hether the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror"].)  The prosecutor

23

indicated she would want to exclude not only prospective jurors who responded "no," but also those who responded "yes" but "pause[d]" in doing so. As Rangel concedes, his trial counsel acknowledged on the record that PJ 22 hesitated or paused in responding whether it was fair to hold the driver guilty. As explained above, the court rejected the defense contention that the prosecutor's question was improper because it did not include "the full law" on aiding and abetting and that people might hesitate in responding because it took them time to process the question. The court instead found the prosecutor's reason for challenging the juror credible, and that her question to PJ 22 was not improper.

Rangel argues that an objectively reasonable person would view race as a factor in the challenge because Rangel, Garcia, and PJ 22 were all apparently Hispanic, and Rangel and Garcia belonged to "a Hispanic gang." First, the record does not show that the prosecutor believed PJ 22 was Hispanic, or even that PJ 22 was in fact Hispanic: the prosecutor stated PJ 22 was "Asian or some kind of descent like that"; Garcia's counsel believed she was Caucasian; and Rangel's counsel believed she was Latina (while agreeing she was "[v]ery light skinned"). Even assuming that PJ 22 was in fact Hispanic or Latina and that the prosecutor was aware of that fact, the circumstances do not necessarily suggest that race played a role in the challenge. It was not only Rangel and Garcia that were Hispanic or Latino, but also the victim (Rosas) and a key witness (Herrera).[7] In evaluating

---

[7] The record does not specifically identify the racial identity of Rosas or Herrera, but in this context we may look to their surnames. (See *People v. Gonzalez, supra,* 104 Cal.App.5th at p. 19.)

whether the improper use of a peremptory challenge occurred, Code of Civil Procedure section 231.7, subdivision (d)(3)(A) permits consideration not only of whether the objecting party is a member of the same perceived cognizable group as the prospective juror, but also whether the alleged victim and witnesses are *not* members of that same perceived group.

Rangel also argues that two other prospective jurors "gave identical 'yes' answer[s]" but were not challenged by the prosecutor and speculates that "there is a fair likelihood that at least one was not [Hispanic]." (See Code Civ. Proc., § 231.7, subd. (d)(3)(D) [court can consider "[w]hether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar, but not necessarily identical, answers but were not the subject of a peremptory challenge by that party"].) Aside from lack of any competent evidence as to the race/ethnicity of these prospective jurors, Rangel's argument fails because nothing in the record establishes that either of these prospective jurors demonstrated any discomfort or hesitation in finding a defendant guilty as an accomplice before answering yes.

## B. The Trial Court Did Not Err in Denying Garcia's Motion to Exclude his Statements to the *Perkins* Agent

Garcia contends the trial court should have excluded evidence of his statements to the *Perkins* agent because Garcia was not advised of his privilege against self-incrimination as required by *Miranda v. Arizona* (1966) 384 U.S. 436, 444 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*) prior to making the statements. As explained below, the trial court did not err in admitting this evidence because Garcia did not know the *Perkins*

25

agent was a police officer and therefore no *Miranda* warning was required.[8]

    1.    *Applicable Legal Principles and Standard of Review*

In *Miranda*, the United States Supreme Court prohibited prosecutors from using statements stemming from custodial interrogation unless they were preceded by an appropriate preliminary warning that the individual has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney. The court defined a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444, fn. omitted.)

In *Perkins*, *supra*, 496 U.S. 292, the high court addressed whether *Miranda* required such warnings where the defendant (Perkins) made incriminating statements to an undercover police officer posing as a cell mate. (*Perkins*, at p. 294.) Suspecting that Perkins had committed a murder, the police placed an undercover officer into his jail cell. The undercover officer "asked [Perkins] if he had ever 'done' anybody. [Perkins] said that he had, and proceeded to describe at length the events of the . . . murder." (*Id.* at pp. 294-295.) Addressing the admissibility of that statement, the Supreme Court noted, "The warning mandated by *Miranda* was meant to preserve the privilege

---

[8] Rangel claims his trial counsel rendered ineffective assistance by failing to join in Garcia's motion to exclude. This claim fails given that the trial court did not err in denying Garcia's motion.

during 'incommunicado interrogation of individuals in a police-dominated atmosphere[,]' [citation] . . . [which] is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' [Citation.] . . . [¶] . . . The[se] essential elements of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. . . . When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id.* at p. 296, quoting *Miranda, supra*, 384 U.S. at pp. 445, 467.)

In evaluating whether a defendant's statement is inadmissible due to the lack of a *Miranda* warning, "[w]e review the trial court's findings of fact for substantial supporting evidence but independently review the trial court's legal determinations." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 197-198.)

2. *Garcia's Motion to Exclude and the Court's Ruling*

On May 5, 2023, Garcia moved to exclude evidence of his statements to the *Perkins* agent on the ground that the statements were made in "a coercive situation." He contended that the *Perkins* agent "paint[ed] a picture of doom," then offered to divulge what Rangel had purportedly said only if Garcia provided information about the shooting first, which caused "a situation where [Garcia] panicked." The prosecutor pointed out that the *Perkins* agent did not suggest the facts of the shooting to Garcia and allowed Garcia to provide the facts. The prosecutor also contended the *Perkins* agent did not act in a coercive manner and that Garcia did not know he was speaking with a police officer.

27

The court denied Garcia's motion to exclude his statements, concluding the circumstances under which the statements were made were not coercive and, "in the mind of Mr. Garcia it's just another inmate that's in there."

3. *Analysis*

It is undisputed that Garcia was unaware the *Perkins* agent was a police officer. Thus, under *Perkins*, no *Miranda* warning was required here.[9]

Garcia contends that a *Miranda* warning was required because "his incriminating statements were obtained under coercive conditions, akin to police custodial interrogation." Garcia argues that coercion was present because the *Perkins* agent "pretended to be a fellow gang member . . . [who was] much older and wiser, and far more knowledgeable and experienced with the criminal justice system." Garcia also relies on the fact that the *Perkins* agent was provided with facts about the shooting and utilized these facts to induce Garcia to discuss his version of the event. In addition, Garcia contends that his failure to answer a gang member's questions could have led to gang-related reprisals while in jail.

We are not persuaded. The concerns underlying the *Miranda* warning requirement are based on the type of "coercion"

---

[9] At the time Garcia made the statements at issue, he had not yet been charged with Rosas's murder. Thus, the *Perkins* operation did not interfere with his Sixth Amendment right to counsel. (*Perkins*, *supra*, 496 U.S. at p. 299 ["After charges have been filed, the Sixth Amendment prevents the government from interfering with the accused's right to counsel"]; see *Maine v. Moulton* (1985) 474 U.S. 159, 176 [106 S.Ct. 477, 88 L.Ed.2d 481].)

28

which uniquely results when a suspect knows he is being questioned by police, such as where the suspect may believe he will be treated more harshly if he is perceived to be uncooperative.  Where the suspect does not know he is speaking with police, these concerns are not present.  (See *Perkins*, *supra*, 496 U.S. at p. 297 ["Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist"].)  As our Supreme Court has stated, "*Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning.  Both adjectives are crucial:  *Miranda* does not apply to noncustodial police interrogation or to nonpolice custodial interrogation.  When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*People v. Williams* (1988) 44 Cal.3d 1127, 1142.)

In *People v. Rodriguez, supra,* 40 Cal.App.5th 194, the defendant claimed, similar to what Garcia argues here, that a *Miranda* warning was required before the defendant talked to an informant while in jail as "he 'felt coerced' because the informant posed as 'an older, well-connected gang member.' " (*Rodriguez*, at p. 198.)  The Court of Appeal rejected this argument because such "coercion" "is not the sort that concerned the *Miranda* court. *Miranda* does not protect suspects when they describe criminal activities to people they think are cellmates.  (. . . *Perkins*, *supra*, 496 U.S. at p. 298.)  Rather, *Miranda* addressed concerns that a 'police-dominated atmosphere' generates 'inherently compelling pressures' that 'undermine the individual's will to resist' questioning.  (*Id*. at p. 296 [quoting *Miranda*, *supra*, 384 U.S. at

pp. 445, 467].)" (*Rodriguez*, at p. 198.) The court also noted that "the government did not brandish its authority or intimidate him into speaking." (*Ibid.*) Garcia contends that *Rodriguez* is factually distinguishable because the suspect and the undercover officer were closer in age than in this case. This factual difference is immaterial, as the *Rodriguez* court based its conclusion that no *Miranda* warning was required on the fact— which is present both here and in *Rodriguez*—that the defendant did not know he was speaking with a police officer.[10]

Lastly, Garcia forfeited his claim that admission of his self-incriminating statements was unconstitutional because the circumstances rendered them unreliable. (See *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 [a confession obtained through "a police officer's misrepresentations or omissions . . . of a kind likely to produce a *false* confession" is inadmissible].) Garcia only claimed in the trial court that his statements were inadmissible on the ground a *Miranda* warning was required because the circumstances were akin to a custodial police interrogation and

---

[10] We also agree with the People that the record does not support Garcia's argument that he was coerced into confessing because he feared gang-related reprisal if he did not provide information. The undercover officer did not purport to be from the same gang as Garcia. Nor did he threaten Garcia with any reprisal or gang punishment. He instead offered Garcia advice based on his purported experience with the criminal justice system. The *Perkins* agent did not demand that Garcia tell him about the shooting and instead offered to describe what Rangel had purportedly told him if Garcia told him his version first. Nothing in the record suggests that Garcia took the *Perkins* agent up on this offer for any reason other than to find out what information Rangel might be providing to police.

"coercive"; he did not make the separate and distinct argument, which he now seeks to assert on appeal, that his statements were unconstitutional on the ground they were unreliable. As a result, he has forfeited this latter claim. (*People v. Saunders, supra*, 5 Cal.4th at p. 590.)[11]

## C. Rangel's Ineffective Assistance of Counsel Claim Related to Redactions of the Recorded Jailhouse Statements Fails

When Garcia moved to exclude his statements to the *Perkins* agent, Rangel's trial counsel stated that he had "an objection to just an aspect of this, but it's not for the whole thing. So I will reserve. . . . I'll just preserve that issue" to raise at a later time. The next court day, however, he withdrew his objection. Rangel now contends his trial counsel rendered ineffective assistance by not moving to redact portions of Garcia's statements in which Garcia claimed that Rangel handed him the gun. Rangel contends the statements were untrustworthy and did not fall under the hearsay exception for statements against Garcia's penal interest.

We conclude that Rangel's ineffective assistance claim fails because even if the statements were otherwise inadmissible, his

---

[11] Even if Garcia had raised this claim below, we would reject it. Garcia focuses on the use of "subterfuge and stratagem" in the *Perkins* operation but he makes no argument how the use of deception or stratagem in this case was likely to result in a false confession. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [appellate court may "treat [an] issue as abandoned" where a party makes a "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case"].)

31

trial counsel had a tactical reason for not seeking to exclude Garcia's statements about Rangel.

1. *Law Governing Ineffective Assistance of Counsel Claims*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," measured "under prevailing professional norms." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) "[W]e will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's . . . omissions." (*Id.* at p. 926.) "Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the

32

evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances." (*People v. Freeman* (1994) 8 Cal.4th 450, 509.)

To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

2. *Rangel's Counsel Had a Conceivable Tactical Reason Not to Seek Redaction of Garcia's Statements Inculpating Rangel*

During the *Perkins* operation, Garcia several times stated that Rangel had handed him the gun in response to questioning from the *Perkins* agent and statements from the agent that Rangel was claiming Garcia had grabbed the gun. The *Perkins* agent first asked Garcia whether he had the gun "in [his] hand or did [Rangel]." Garcia responded, "No, he had it and he gave it to me. I didn't take it. He gave it to me." The *Perkins* agent followed up stating, "[Rangel] told me you got it from the console," to which Garcia responded that Rangel was "lying." Later, the *Perkins* agent told Garcia, "[Rangel] said it was his gun, but he had it in the console and that you grabbed it," to which Garcia responded, "No, [Rangel] gave it to me." The *Perkins* agent also told Garcia, "[Rangel] basically is saying that you guys were driving, [Herrera] had [Rangel's] gun in the center divider and you grabbed it and jumped out, that he didn't even know—he goes, you think I'm going to be doing shit in my mom's car. Like, come on you know the little homie just jumped out and

33

did something stupid."  Garcia responded, "There's not [*sic*] fucking way he say all that."

Rangel contends his trial counsel rendered ineffective assistance by failing to seek exclusion of these statements by Garcia.  This claim fails because Rangel's counsel had a "conceivable reason" (*People v. Weaver, supra*, 26 Cal.4th at p. 926) for failing to seek exclusion.  With the statements in evidence and without having himself to testify, Rangel could seek to include statements by the *Perkins* agent to Garcia which were helpful to Rangel's trial strategy, specifically, statements that Rangel had told the *Perkins* agent that he did not hand the gun to Garcia and that he did not know Garcia was going to shoot.  These statements were relevant context that Garcia might have untruthfully claimed Rangel had handed him the gun.  If Rangel sought to exclude Garcia's statements that Rangel had handed him the gun, it might have resulted in exclusion of those statements *and* the *Perkins* agent's statements about what Rangel had purportedly told him.

We start with the *Perkins* agent's statements to Garcia that Rangel was claiming he did not know Garcia would shoot Rosas.  The *Perkins* agent told Garcia that, "[Rangel] basically is saying that . . . [Garcia] grabbed [the gun] and jumped out, that he didn't even know . . . ," that Rangel and Herrera "[were] going to [be] witness[es] against [Garcia]" and Rangel would "say[] that [Garcia] . . . jumped out of the car and did [*sic*] on [his] own without [Rangel and Herrera] knowing," and that Herrera and Rangel "even told [Garcia] . . . that [Rosas was not] a rival."  Although these statements were not offered for the truth of the matter, they were nonetheless helpful to Rangel in arguing his case.

This strategy is not one we have conjectured; the record confirms it. First, counsel asked Detective Landreth whether Landreth had given the *Perkins* agent the information that Rangel claimed "[Garcia] grabbed [the gun] and jumped out, that he didn't even know," and that Rangel said he would not have engaged in a gang shooting in his mother's car and it was clear that Garcia "just jumped out and did something stupid." The detective denied that the *Perkins* agent had been provided with that information other than that the white Prius belonged to Rangel's mother. The court observed that Rangel's counsel was apparently "insinuati[ng that] things that the *Perkins* agent told Mr. Garcia came from Rangel's interview."

Rangel's counsel contended that he needed to cross-examine the *Perkins* agent (who ended up not being a witness at trial) to clarify whether the agent was passing along information that Rangel had actually provided to him or was making it up, and also that counsel should be "allow[ed] . . . to argue to the jury that those statements [the *Perkins* agent claimed Rangel had made to him] were received from Mr. Rangel." Alternatively, he sought to introduce evidence of Rangel's recorded statements in a *Perkins* operation conducted on him which were consistent with what the *Perkins* agent conveyed to Garcia. In denying Rangel's alternative motions on hearsay grounds, the court observed, "we're dealing with the potential of argument by [Rangel's counsel] of the truth of the matter asserted, the *Perkins* agent's recitation that Mr. Rangel said, 'no, no, no, I didn't pass it to him. He grabbed it' or, you know, it was taken from the center console by Mr. Garcia."

In addition, when the court invited the parties to request the jury be instructed that what the *Perkins* agent said was not

evidence, Rangel's counsel objected and the court did not give such an instruction. Then, during his closing argument, Rangel's counsel quoted from the *Perkins* operation recording, including the *Perkins* agent's statements that Rangel claimed he did not know what Garcia was going to do. Counsel also argued that Garcia claimed Rangel handed him the gun in retaliation because the *Perkins* agent made him believe Rangel was "laying him out to dry" by claiming Garcia had acted on his own.

Given the usefulness to Rangel of the *Perkins* agent's statements, Rangel's counsel had a conceivable tactical reason to not seek exclusion of Garcia's statements that Rangel had handed him the gun. Specifically, counsel could have conceivably perceived a risk that, if he convinced the court to redact Garcia's statements on that topic, then the prosecutor could persuasively argue that the *Perkins* agent's statements about what Rangel was claiming should be redacted too. Rangel's strongest argument to keep the *Perkins* agent's statements were that they demonstrated Garcia had a bias against Rangel and, thus, a motive to lie about Rangel handing him the gun. Rangel's counsel made this very point about bias in his closing argument, and Rangel reiterates the point on appeal. Thus, if Rangel's counsel moved to redact Garcia's statements inculpating Rangel, he would lose perhaps his best argument to keep in the *Perkins* agent's statements. In sum, Rangel's trial counsel conceivably could have concluded that Rangel had a choice—either the jury would hear both Garcia's statements (that Rangel had handed him the gun) and the *Perkins* agent's statements (that Rangel was claiming he did not hand the gun to Garcia nor know Garcia was going to shoot) or neither—and that Rangel benefitted more by having the jury hear both as opposed to neither.

36

Rangel argues the *Perkins* agent's statements about what Rangel had purportedly told him were inadmissible hearsay. But, as discussed above, Rangel's counsel nonetheless used the statements, in his questioning and closing argument, to suggest to the jury that Rangel had in fact claimed he did not know that Garcia would shoot Rosas and did not give Garcia the gun, and to argue that Garcia's statements about Rangel were not credible. Counsel also objected to a curative instruction on the issue. Rangel also asserts, "if [his] counsel had objected and requested redaction of those portions of Garcia's *Perkins* statement inculpating [Rangel], the remaining portion of Garcia's *Perkins* statement including what [Rangel] purportedly told the *Perkins* agent, would have still been admitted." Perhaps. Perhaps not. What matters instead is that Rangel's counsel could have reasonably anticipated, were the court to have excluded Garcia's statements that Rangel handed him the gun, it would have also excluded the *Perkins* agent's statements about what Rangel told him. That was a rational tactical choice that we may not second guess in the guise of an ineffective assistance of counsel claim. (*People v. Midell* (2025) 113 Cal.App.5th 1060, 1078.)

## D. The Trial Court Did Not Err in Refusing to Strike the Firearm Enhancement

Garcia contends the trial court abused its discretion under section 1385 in failing to strike the section 12022.53, subdivision (d) firearm use enhancement when sentencing him. Under section 1385, "the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (*Id.*, subd. (c)(1).) "In exercising its discretion [to dismiss an enhancement], the court shall consider and afford great weight to evidence

37

offered by the defendant to prove that any of the mitigating circumstances [set forth in the statute] are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."  (*Id.*, subd. (c)(2).)

Garcia forfeited this claim by failing to raise it in the trial court.  "Under section 1385, a defendant 'ha[s] the right to "invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading". . . .' (*People v. Carmony* (2004) 33 Cal.4th 367, 375 . . . .)  However, 'any failure on the part of a defendant to invite the court to dismiss under section 1385 . . . waives or forfeits his right to raise the issue on appeal.' (*Id.* at pp.375-376.)"  (*People v. Coleman* (2024) 98 Cal.App.5th 709, 724.)  In general, "complaints about the manner in which the trial court exercises its sentencing discretion . . . cannot be raised for the first time on appeal."  (*People v. Scott* (1994) 9 Cal.4th 331, 356.)  "Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing."  (*Id.* at p. 353.)

Garcia asserts in his appellate briefing that he made a "request to strike or reduce" the sentence on the enhancement, but the record does not support this assertion.  Garcia's counsel in fact "ask[ed]" the court to impose a total sentence on Garcia "closer to th[e] range" of the sentence the court had imposed in an unrelated case earlier in the day.  In making this request, counsel did not focus on any specific component of his sentence, nor did

38

he request or suggest that the court strike or reduce the sentence on the firearm use enhancement.  Accordingly, Garcia has forfeited his claim that the trial court erred in failing to strike the firearm enhancement.  (*People v. Coleman, supra*, 98 Cal.App.5th at p. 724 [the defendant forfeited claim that trial court abused its discretion in not striking a firearm use enhancement].)

Even if we overlooked Garcia's forfeiture, we would reject his argument.  " 'The trial court is not required to state reasons for declining to exercise its discretion under section 1385' [citations], and 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary' [citation]."  (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.)  As purported indicia the court applied the incorrect legal standard in refusing to strike the firearm enhancement, Garcia points to an unrelated issue—namely, the court's true finding of an allegation under California Rules of Court, rule 4.421(b)(1) that Garcia "engaged in violent conduct that indicates a serious danger to society."  This alleged error did not impact the imposition of the firearm enhancement, which is the only sentencing issue Garcia raises.  A finding that the court made with respect to a factor in aggravation in selecting among the sentencing triad for certain crimes does not necessarily bear upon the distinct issue of whether, under section 1385, subdivision (c)(2), "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."  Nor does it show error in the court's consideration of whether to exercise its discretion concerning that enhancement.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

40